**Patricia Kay ROGERS, Donnie Ray Harvey, Jr., Gary Alan Harvey, Albert Voytek, Elizabeth Voytek, and Mark Layne Howell, Individually & as Heir of the Estate of Patricia Ann Howell, Deceased, and on Behalf of the Estate of Patricia Ann Howell, Deceased, Petitioners,**

v.

**Brian Bernard BRADLEY, M.D., Respondent.**

No. 94–0861.

Supreme Court of Texas.

Aug. 1, 1995.

Rehearing Overruled Aug. 30, 1995.

GAMMAGE, Justice.

The rule's language is clear, simple and unequivocal: Texas Rule of Appellate Procedure 15a provides that an appellate judge "shall disqualify or recuse himself in any proceeding in which judges must disqualify themselves under Texas Rule of Civil Procedure 18b. . . ." Rule 18b provides in relevant part that a judge "shall recuse himself in any proceeding in which . . . his impartiality might reasonably be questioned." Tex. R.Civ.P. 18b(2)(a).

The language is imperative and mandatory, not permissive or discretionary; the standard is objective, not subjective.

The problem is the perception created by a nineteen-minute video produced by TEX–PAC, the political action committee of the Texas Medical Association. A parody of *Star Wars* entitled Court Wars III, the video was intended to garner support for TEX–PAC's favored candidates for the Texas Supreme Court in the 1992 general election. By analogizing the Texas Trial Lawyers' Association to Darth Vader's evil empire and a "bipartisan coalition of medicine, business, agriculture and industry" to the champions of "fairness, impartiality and reform," the video sought to persuade viewers that the election of certain candidates to the Texas Supreme Court was important in their professional and personal lives. The video urged physicians not only to contribute money, but also to "conduct grass roots efforts . . . from . . . slate cards to office displays, voter information materials and handouts, to sample letters to communicate with your patients, colleagues and friends, to signature-styled newspaper ads . . . ."

In the 1992 general election, TEX–PAC supported incumbent Justice Jack Hightower's re-election bid, Fifth Court of Appeals Chief Justice Craig T. Enoch's challenge to incumbent Justice Oscar Mauzy, and incumbent Justice Eugene A. Cook's re-election campaign against 131st District Court Judge Rose Spector. While the names of the three endorsed candidates were shown several times on a red-and-white "slate card," all five of the named candidates appeared in the video. Four of the candidates were taped at the Houston Bar Association Litigation Section candidate's forum in early 1992. Footage of then-Justice Mauzy, who did not participate in the forum, was taken from a 1987 CBS 60 Minutes broadcast entitled "Justice for Sale," in which he appeared to defend the then current system of financing Texas judicial campaigns. None of the candidates were filmed expressly or exclusively for the video project, and none of them gave TEX–PAC permission to use their image for the video.

The TEX–PAC video also contained brief comments by two incumbent justices not on the ballot in 1992, Justice Cornyn and Justice Hecht, regarding the importance of involvement in Texas Supreme Court elections. In full, Justice Cornyn states:

> Well, unfortunately, it's never the type of job when you can say, "Well, we've fixed it, and we can move on to other things." Unfortunately, the political process is a dynamic process. There is always an ebb and flow. And if you think that you've fixed it and ignore it, then it will fall back into a state of disrepair once again, back to the problems that started the reform movement in the first place. . . . Working in a campaign headquarters, licking stamps and envelopes, working in a phone bank, putting on fund-raisers in your home, things like that have a—really a disproportionate impact for good in judicial elections.

Justice Hecht's complete comments are as follows:

> The job is not done; the job is never done. Freedom requires diligence, and we must pursue every time the issue is raised.

Neither Justice Cornyn nor Justice Hecht made these comments for the video project in particular or even for the 1992 election in general. TEX–PAC recorded Justice Cornyn's remarks in 1991 and Justice Hecht's in 1989, shortly after the close of their respective election campaigns. While both justices

gave TEX–PAC permission to use their comments, neither exercised any control over the format in which they would be used or over what other material would be included.

Furthermore, the video also briefly pictured TEX–PAC's 1988 and 1990 red-and-white "slate cards," showing TEX–PAC's previously successful support for Chief Justice Phillips and Justices Gonzalez, Hightower, Hecht, Cornyn, and Gammage. In all, therefore, eight of the nine current justices are either pictured or mentioned in the TEX–PAC video, seven favorably.

In an effort to drive home the importance of the Court races, the video goes beyond general statements to focus on the consequences of one particular medical malpractice case. Pointing to this case, the narrator alleges that "[a]n unjust legal system that punishes the innocent, along with the guilty, still flourishes in Texas, and medicine will always be a prime target." The defendant doctor is described as being "faced with bankruptcy, all for coming to the rescue of a patient in desperate need of his help." This "tragic situation" is called "a classic exercise [example] in Texas justice where no good deed goes unpunished." Although a similar situation could "happen anytime in any place," the doctor is not without hope, as "[he] has a Supreme Court he can appeal to, if we prevail in November. Without that, he would have no chance, and his career would be ruined as a practicing physician." (emphasis added) The doctor himself then appears on the video, stating in part:

And for me personally, it is absolutely vital that I have a fair Supreme Court. The issues that came up in this case pertain to every doctor, and every doctor in the state suffers the same gross, how shall I say, reversal of what would be commonly thought of as justice. And, therefore, it's absolutely vital to me that we need to know who is on the Supreme Court and where they're coming from. (emphasis added)

The doctor whose case is highlighted and who appears on the video is Brian Bernard Bradley, the respondent in the matter before us. Our appellate rules provide that an appellate judge "shall disqualify or recuse himself in any proceeding in which "judges must disqualify themselves under Texas Rule of Civil Procedure 18b...." Tex.R.App. p. 15a. The video makes a direct and express association between support for certain candidates and the probable result in a particular pending case. While the text carefully speaks of TEX–PAC–supported judges as "independent" and "fair," the whole tenor of the video suggests ineluctably that Bradley's fate hangs on the presence of particular justices on the Texas Supreme Court whom TEX–PAC supported.

I believe that (1) where a person or entity has sought to engender support, financial or otherwise, for a judicial candidate or group of candidates, and (2) where that effort is made through a medium which is intended to be widely circulated, and (3) where that effort ties the success of the person's or entity's chosen candidate or candidates to the probable result in a pending or impending case, a judge should recuse from participation in that case under Rule 18b(2)(a). The rule does not require that the judge must have engaged in any biased or prejudicial conduct. It does require the judge to recuse if "his impartiality might reasonably be questioned," regardless of the source or circumstances giving rise to the question of impartiality and even though the source and circumstances may be beyond the judge's volition or control.

Because I believe a reasonable member of the public at large, knowing all the facts in the public domain, would doubt that the justices portrayed favorably in the TEX–PAC video are actually impartial I recuse myself from participation in all matters related to this cause.

Transcript of TEX–PAC commercial entitled *Court Wars, the Fight to Defend the Court,* is attached as an Appendix and made a part of this declaration of recusal.

## APPENDIX

### COURT WARS

### THE FIGHT TO DEFEND THE COURT

NARRATOR: In the early 1970s, a handful of the richest, most powerful personal

injury lawyers in Texas devised a scheme to seize control of the Texas Supreme Court, using big-money politics to rewrite Texas law and tilt Texas justice unfairly in their favor.

By 1976, they had succeeded. The Texas legal system became their hunting ground. Business and health care were forced to run for cover under the threat of an activist Supreme Court with a legislative agenda.

Insurance premiums soared. Hospitals and doctors were forced out of business. Corporations fled Texas. New businesses stayed away. And the people suffered. Even the network's "60 Minutes" asked:

MIKE WALLACE: Is justice for sale in Texas? Some recent headlines might make you wonder. The *Wall Street Journal* has called the decision of one Texas court a national embarrassment. The *New York Times* editorialized that the conduct of the Texas courts is reminiscent of what passes for justice in small countries run by colonels in mirrored sunglasses.

NARRATOR: In 1988, a bipartisan coalition of medicine, business, agriculture and industry arose. And the people reclaimed the Supreme Court in the name of fairness, impartiality and reform, ousting five of the trial lawyer's handpicked candidates and restoring balance to the Court. A clean slate for '88.

In 1990, medicine again took the lead and defeated the trial lawyers by electing three more reform candidates. The Court to support in '90.

Now the empire strikes back. The trial lawyers are massing their considerable forces for another assault on the Court. The last of their handpicked Supreme Court judges is seeking reelection to a six-year term. They are preparing for the fight of their lives on Tuesday, November 3rd, 1992. Judgment Day '92.

Though thwarted in the last two election cycles, the trial lawyers have made it painfully clear that they are back; that this year they will spare no expense to reestablish their grip on the Supreme Court, to obliterate the efforts of four years of Supreme Court reform, to turn back the clock to 1976 and return the Court and the laws to their way of thinking.

JOE JAMAIL: That's bullshit and naive. You know it and I know it.

KIM ROSS: The trial lawyers are not easily intimidated. They certainly aren't plagued by self-doubt. They have raised and spent already over half a million dollars in the primaries. They recruited a candidate to run against Jack Hightower. They recently won a crucial state Senate race by dumping $200,000 in in the last two weeks. They are down to their last set of votes on that bench, and they are coming to take the Court back.

NARRATOR: Medicine's fight to defend the Court began in the democratic primary, when our adversaries recruited one of their own hanging judges to challenged Supreme Court Justice Jack Hightower, one of the clean-slate '88 reform team. The defense of Judge Hightower was led in the primary by TEXPAC, the Texas Medical Association Political Action Committee, and TEXPAC will lead the defense of this outstanding and independent judge once again on judgment day, November 3rd.

Justice Hightower is one of three TEXPAC-endorsed candidates for the Supreme Court, along with incumbent Supreme Court Justice Eugene Cook and Dallas appeals court Chief Justice Craig Enoch; three outstanding judges who will maintain the balance on the Court, and who have also been targets for the richest and most powerful political operatives in Texas.

PAT MALONEY: There are times when only a jury and a judge can resolve a serious injury dispute between a patient and a doctor or a hospital. Lawyers who try these medical malpractice cases must have special experience and be able to master the area of medicine involved.

NARRATOR: For almost a year, multimillionaire trial lawyer Pat Maloney of San

Antonio has been raising money for Justice Cook's opponent, Rose Spector, proudly pointing out her history of siding with trial lawyers in multimillion dollar lawsuits. In this letter he cites her decision, which gained Maloney a $56 million verdict.

Justice Cook was elected in 1988 as part of the clean slate and has established an enviable track record of independence and impartiality.

JUSTICE EUGENE COOK: As judges, we have only one constituency, the people of Texas, not the defense bar or the plaintiff's bar, not urban or rural, not East Texas or West Texas. We don't represent lawyers; we represent the people of Texas.

NARRATOR: The race which will attract the most media attention will be in Place 1, where Justice Enoch is challenging Oscar Mauzy, the last seat on the trial lawyers' handpicked Supreme Court bench. Mauzy, a long-time trial lawyer and state Senator, came to the Court with an agenda, to finish the job he started in the state Senate.

In 1987, in an attempt to extend the Deceptive Trade Practices Act to doctors and other professionals, he said it directly. When asked how that case differed from a similar recent case where the Court ruled for the defendant, Mauzy wrote, "The answer to that question is that the makeup of this Court has changed." You recall Mauzy's cozy judicial relationship with internationally famous trial lawyer Joe Jamail was highlighted in the now infamous "60 Minutes" expose.

MIKE WALLACE: So the lawyers are just interested in good government, in good justice here in Texas?

JUSTICE OSCAR MAUZY: Well, I think you have to talk to every individual to find out. There may be some individual somewhere who may have a private slant. I'm pleased that over half the people that contributed to me last year were not lawyers. They were people who have known me a long time and ...

MIKE WALLACE: In numbers?

JUSTICE OSCAR MAUZY: In numbers, that's right.

MIKE WALLACE: Of people.

JUSTICE OSCAR MAUZY: Yes.

MIKE WALLACE: But in dollars, up to a million and a half, most of them were lawyers.

JUSTICE OSCAR MAUZY: I'd have to look at my financial campaign reports to see.

MIKE WALLACE: I have.

JUSTICE OSCAR MAUZY: Okay.

MIKE WALLACE: And most of them were law firms and individual lawyers, among them, of course, your good personal friend Joe Jamail, correct?

JUSTICE OSCAR MAUZY: Well, as I say, the report speaks for itself.

NARRATOR: Still, the trial lawyers have pledged to defend Mauzy to the bitter end. In the primary, they secretly funded and drove the campaign of perennial candidate Charlie Ben Howell against Justice Enoch in an attempt to, quote, keep Mauzy on the Supreme Court, end quote.

Clearly, the battle lines have been drawn and the challenge issued. Medicine must take the lead once again.

FRANK TEJEDA: I was taught early on that when good men do nothing, then evil will triumph.

CHARLES BAILEY, JR., M.D.J.D.: This system, although it was one that once worked in a satisfactory way to compensate an injured individual in a fair and just manner, has become distorted. The mentality of the Ed McMahon giveaways and the lottery and so forth have prevailed, and the system has become one not of making one whole again in the sense to cover the consequences of an injury, but to make individuals who have been injured extravagantly wealthy, along with their attorneys.

JOSEPH PAINTER, M.D.: If we don't organize and if we don't support candidates who will listen to us and at least give our side fair consideration and think of at least medicine's viewpoint, then surely we're going to have our adversaries elect those people who would be against us and who would be against what is best for the medical care in Texas.

JUSTICE JOHN CORNYN: Well, unfortunately, it's never the type of job when you can say, "Well, we've fixed it, and we can move on to other things." Unfortunately, the political process is a dynamic process. There is always an ebb and flow. And if you think that you've fixed it and ignore it, then it will fall back into a state of disrepair once again, back to the problems that started the reform movement in the first place.

NARRATOR: The handwriting is already on the wall. An unjust legal system that punishes the innocent, along with the guilty, still flourishes in Texas, and medicine will always be a prime target.

Consider the case of Dr. Bernard Brian Bradley, a pulmonary specialist who was called into a Pasadena emergency room to rescue two patients who had undergone liposuction procedures in another physician's office and had experienced severe adverse reactions.

In spite of his efforts to save two patients of another physician, Dr. Bradley was sued in the Houston court of Judge Richard Bianchi, a former lobbyist for the Trial Lawyers Association. In March of 1992, Bradley was ordered to pay $20 million. Bianchi also denied repeated motions for a new trial and to reduce the amount of the bond Bradley must post pending appeal.

Dr. Bradley is now faced with bankruptcy, all for coming to the rescue of a patient in desperate need of his help.

BERNARD BRADLEY, M.D.: The plaintiffs and the defendants bargained about how much money could be put on the table. And

I can think of nothing more like a hostage situation. The doctors of the rescuing team at periods got together, and it was exactly like, come up with the money or we'll start shooting you one at a time. In fact, that was actually said, "We're going to get you one at a time."

KIM ROSS: Dr. Bradley's tragic situation is a classic exercise in Texas justice where no good deed goes unpunished. It can happen anytime in any place. Thankfully, Dr. Bradley has a Supreme Court he can appeal to, if we prevail in November. Without that, he would have no chance, and his career would be ruined as a practicing physician.

BERNARD BRADLEY, M.D.: The issues that are raised here are very important, and it may well be a bigger fight, and it may well be deferred to a Supreme Court. And for me personally, it is absolutely vital that I have a fair Supreme Court. The issues that came up in this case pertain to every doctor, and every doctor in this state suffers the same gross, how shall I say, reversal of what would be commonly thought of as justice. And, therefore, it's absolutely vital to me that we need to know who is on the Supreme Court and where they're coming from.

NARRATOR: The more things change, the more they remain the same. On judgment day, November 3rd, 1992, doctors and doctors' spouses must make their stand again and help elect Craig Enoch, Eugene Cook and Jack Hightower to the Texas Supreme Court.

How? The same way we've always done it. With a strong, dedicated grass roots campaign, medicine can make a difference in '92.

NANCY DICKEY, M.D.: We can make a difference in terms of our colleagues and our neighbors and our patients. We can make a difference in providing some funding support.

CHARLES BAILEY, JR., M.D.J.D.: Certainly the trial lawyers have a strong belief in what they're doing, and they express that through their generosity with their gifts.

And I think that the physicians should answer this challenge.

FRANK TEJEDA: Dollars are very important, probably too important. However, to me a grass roots campaign and personal involvement is just as important, if not more so.

SAM NIXON, M.D.: It takes voting, it takes working, it takes phoning, it takes writing letters, it takes passing out cards.

JUSTICE JOHN CORNYN: Working in a campaign headquarters, licking stamps and envelopes, working in a phone bank, putting on fund-raisers in your home, things like that have a—really a disproportionate impact for good in judicial elections.

NANCY DICKEY, M.D.: When we as the Texas Medical Association looked at the Supreme Court race for the first time, I was a little uncomfortable about bringing that issue into my office. And yet, after I provided information to my patients, I had people come up to me weeks after the election and say, "You know, that's the first time anybody has given me good, valid information about the Supreme Court. Thank you, Dr. Dickey."

NARRATOR: This year TEXPAC can provide you with a host of materials to help you conduct the grass roots efforts in your community, From "Judgment Day" slate cards to office displays, voter information materials and handouts, to sample letters to communicate with your patients, colleagues and friends, to signature-styled newspaper ads, which you can customize and place in your local paper.

Judgment Day is coming for all of us. Take your stand. Register to vote. Spread the word. Join TEXPAC.

SAM NIXON, M.D.: By coming together in TEXPAC, we magnify our voices. A single voice is fine, but many voices are much louder, much more potent, much more productive in the political process. That's why we need you in TEXPAC.

JOSEPH PAINTER, M.D.: It is ludicrous for us as physicians to sit around and complain and ask for these statutory remedies or Band–Aids and turn our back on the—who sits on the Supreme Court. And nobody accomplishes anything in the coffee rooms or in the doctors' lounges ventilating their frustration and their anger against the system unheard by the masses.

BERNARD BRADLEY, M.D.: Every doctor in an emergency room, every doctor who is called to see dying patients in an intensive care unit, every obstetrician, it will happen to you. There is nothing to stop a plaintiff attorney distorting a case so much that they will damage every physician in Texas.

JUSTICE NATHAN HECHT: The job is not done; the job is never done. Freedom requires diligence, and we must pursue every time the issue is raised.

KIM ROSS: The fight to defend this Court the physicians worked so hard to elect is just beginning, and it's going to be a long, hard fight.

NARRATOR: In 1988 and 1990, you made the difference in the Texas Supreme Court. Judgment Day is November 3rd, 1992.

(End of Videotape of "Court

(Wars, the Right to Defend

(the Court"

Transcription Done By:

/s/ Cynthia A. Smith
Cynthia A. Smith, CSR, RPR
Certification No. 2408
Date of Expiration: 12–31–94
1210 The Norwood Tower
114 West Seventh Street
Austin, Texas 78701
(512) 499–0277

ENOCH, Justice, responding to declaration of recusal.

## I.

Patricia Rogers and Patricia Howell each hired Dr. Hugo Ramirez to perform liposuc-

tion. Each had the procedure performed on the same Friday and, unfortunately, Dr. Ramirez used the same drainage tube on each woman. They became critically ill that weekend and were admitted to the emergency room at the same hospital, Humana Hospital, on Sunday afternoon, Howell at approximately 1:30 and Rogers at approximately 4:30. By 10:00 that night, Howell's condition had deteriorated significantly, and Dr. Bernard Bradley, a pulmonary specialist, was called in. While treating Howell, Bradley learned that another patient, Rogers, was suffering from similar symptoms. He treated both women for septic shock. The following morning, each woman displayed symptoms of necrotizing faciitis, a serious skin infection, and they both were transported to St. Luke's hospital where they underwent surgical debridement. Rogers survived, but she has since undergone several reconstructive operative procedures. Howell died on the operating table. Rogers and the survivors and estate of Howell sued Ramirez, Bradley, the hospital and other treating physicians. In Rogers' case, the jury found Ramirez 50% at fault, and both Bradley and another doctor each 25% at fault, and awarded more than nine million dollars against the defendants jointly and severally. In Howell's case, the jury found Ramirez 75% at fault and Bradley 25% at fault, and awarded joint and several damages in an amount exceeding six million dollars. The other doctor and Humana Hospital settled. Ramirez filed bankruptcy. Bradley alone remains in the case.

The court of appeals reversed the trial court's judgment on the jury verdict, finding no evidence of proximate cause. Rogers and Howell's estate and survivors have filed a writ of error in this Court challenging the reversal. In addition, they have moved to recuse Justices Hightower, Hecht, Cornyn and me from further participation in this proceeding. *See* Tex.R.App.P. 15a (incorporating by reference Rule 18b which provides in relevant part: "A judge shall recuse himself in any proceeding in which ... his impartiality might reasonably be ques-

tioned...." Tex.R.Civ.P. 18b(2)(a)). The essence of Rogers' complaint is that the Texas Medical Association Political Action Committee, TEX–PAC, campaigned too aggressively; it tied the outcome of a particular case, this case, to the election of certain judges. As such, the judges they supported should be recused. Rogers and Howell's estate apparently distinguish between judges supported, rather than attacked, by an aggressive campaign.

At the outset, I note that no grounds for constitutional or rule-based disqualification are presented in this case. Tex.Const. art. V, § 11; Tex.R.App.P. 15a. Further, while Justice Gammage chooses to recuse, he writes extensively about the appearance of other candidates and current justices on the TEX–PAC video, citing to no conduct by himself or any other justice which in his view even remotely implicates recusal. Because I disagree with his reasoning, I am responding with my reasons for continuing to sit and decide the issues of this case and for voting to overrule the motion to recuse the other justices.

## II.

All judges have the duty to sit and decide matters brought before them, unless there is a basis for disqualification or recusal. *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 823–24 (Tex.1972); Tex.Code Jud.Conduct, Canon 3, pt. 3(B)(1) (1974), *reprinted in* Tex.Gov't Code, tit. 2, subtit. G app. I specifically believe that "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir.1992). As a theoretical matter, at the outset in every case all judges assess whether or not to recuse. A party's motion to recuse simply initiates a more formal process of consideration. When a motion to recuse is filed, the implicated judge could decide that recusal is appropriate and voluntarily recuse thereby mooting the motion. If the judge deems there is no basis for the recusal, the motion is presented to the entire court for consideration. Tex.

R.App.P. 15(c). In this case, excluding Justice Gammage, we have each declined to recuse and the Court, therefore, has addressed Rogers' motion to recuse the four justices as a preliminary matter before turning to the merits of the case. After due consideration, Rogers' motion to recuse has been denied as to each of the four justices.

### III.

In deciding whether to vote to recuse, I start with the requirement spelled out in Rule 18b(2)(a). Language similar or identical to our rule is used as a standard for judicial recusal under federal law, the Codes of Judicial Conduct of the federal system, and most states, including Texas. Thus, there is a growing body of case law in various jurisdictions that can assist us in correctly applying this standard.

Since 1974, the United States has also required federal justices, judges, and magistrates to "disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The provision erects an objective standard of conduct and was enacted to help promote public confidence in the integrity of the judicial process. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859–61, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988) (citing S.Rep. No. 93–419, p. 5 (1973); H.R.Rep. No. 93–1453, p. 5 (1974)).

Presumably this language was derived from the American Bar Association's 1972 Model Code of Judicial Conduct. Canon 3C(1) of the Model Code provided: "A judge should disqualify himself in a proceeding where his impartiality might reasonably be questioned...." Model Code of Judicial Conduct Canon 3C(1) (1972). Except for the addition of gender-neutral language, this provision remained unchanged when the ABA promulgated a new Model Code in 1990. With slight textual changes in some jurisdictions, Canon 3C(1) has been adopted by the United States Judicial Conference and the highest courts of most states in their respective codes of judicial conduct. *See* Shaman, et al., Judicial Conduct and Ethics 101–3 (1990). The Judicial Section of the State Bar of Texas adopted an aspirational set of canons based largely on the ABA's canons in 1963. *See* 27 Tex.B.J. 95–103 (1964).

Applying this rule, several federal circuit courts have held that recusal should follow if the reasonable person, aware of all of the circumstances, would harbor reasonable doubts about the judge's impartiality. *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987); *In re Yagman*, 796 F.2d 1165, 1179 (9th Cir.1986); *United States v. Dalfonso*, 707 F.2d 757, 760 (3d Cir.1983); *United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir.1981); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Rice v. McKenzie*, 581 F.2d 1114, 1116 (4th Cir.1978). Two other circuits have discussed recusal in terms of whether the reasonable person would have significant doubts as to whether justice would be done. *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir.1992); *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985). Last year four justices of the United States Supreme Court articulated their own test, stating that the statute "is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings." *Liteky v. United States*, —— U.S. ——, ——, 114 S.Ct. 1147, 1158, 127 L.Ed.2d 474, 492 (1994) (Kennedy, J., concurring, joined by Blackmun, Stevens, and Souter, JJ.). While the justices' test addresses neither the quantum of doubt sufficient to trigger statutory disqualification, nor how much knowledge of all the facts the reasonable person must possess, it does reference a critical factor that is implied in the other standards. It is the conduct of the *judge* that is being examined, not the conduct of some third party.

State courts interpreting Canon 3C(1) or its equivalent have articulated reasonable-person tests similar to those devised in the

federal courts. *See Pride v. Harris,* 882 P.2d 381, 384 (Alaska 1994); *State v. Mann,* 512 N.W.2d 528, 532 (Iowa 1994); *Farm Credit Bank of St. Paul v. Brakke,* 512 N.W.2d 718, 720 (N.D.1994); *Tyson v. State,* 622 N.E.2d 457, 459 (Ind.1993); *Ball v. Melsur Corp.,* 161 Vt. 35, 633 A.2d 705, 709 (1993); *Blaisdell v. City of Rochester,* 135 N.H. 589, 609 A.2d 388, 390 (1992); *Rutland v. Pridgen,* 493 So.2d 952, 954 (Miss.1986); *United Farm Workers of America v. Superior Court,* 170 Cal.App.3d 97, 216 Cal.Rptr. 4, 10 (1985); *State v. Logan,* 236 Kan. 79, 689 P.2d 778, 784 (1984); *Papa v. New Haven Fed'n of Teachers,* 186 Conn. 725, 444 A.2d 196, 207 (1982).

Some jurisdictions have attempted to further define the reasonable person at the center of each of these standards. Alabama, for example, repeatedly has held that "the test is whether a person of ordinary prudence in the judge's position knowing all of the facts known to the judge finds that there is a reasonable basis for questioning the judge's impartiality." *Ex parte Cotton,* 638 So.2d 870, 872 (Ala.1994) (citations omitted); *see, e.g., Boros v. Baxley,* 621 So.2d 240, 243 (Ala.1993); *accord Jefferson-El v. State,* 330 Md. 99, 622 A.2d 737, 741 (1993); *Alley v. State,* 882 S.W.2d 810, 820 (Tenn.Crim.App. 1994).

Still other states have adopted standards that seem highly deferential to the movant seeking to disqualify or recuse a judge. For example, under Colorado law, a judge assessing a motion for disqualification must:

> accept as true the facts stated in the motion [to disqualify] and accompanying affidavits.... The judge must look only to the legal sufficiency of the motion and affidavits. To be legally sufficient, the documents must "state facts from which it may reasonably be inferred that the judge has a bias or prejudice that will prevent him from dealing fairly...." Facts are required; conclusory statements, conjecture, and innuendo do not suffice.

*Zoline v. Telluride Lodge Ass'n,* 732 P.2d 635, 639 (Colo.1987) (citations omitted). *Accord Livingston v. State,* 441 So.2d 1083, 1086 (Fla.1983); *Smith v. State,* 250 Ga. 438, 298 S.E.2d 482, 483 (1983).

Although Texas courts have decided several cases under the reasonable person standard of our recusal rule, no decision has yet articulated a clear standard for recusal. *See, e.g., Wright v. Wright,* 867 S.W.2d 807 (Tex. App.—El Paso 1993, writ denied); *Keene Corp. v. Rogers,* 863 S.W.2d 168 (Tex.App.— Texarkana 1993, no writ); *Aguilar v. Anderson,* 855 S.W.2d 799 (Tex.App.—El Paso 1993, writ denied); *Enterprise–Laredo Assocs. v. Hachar's, Inc.,* 839 S.W.2d 822 (Tex.App.—San Antonio), *writ denied,* 843 S.W.2d 476 (Tex.1992) (per curiam). The Court of Criminal Appeals has cited the *Potashnick* standard with approval, but apparently in the context of disqualification mandated under due process rather than under rules of appellate procedure. *Kemp v. State,* 846 S.W.2d 289, 305–06 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). Whether the standard has been clearly articulated, the courts of Texas as with most other states also implicitly assume that it is the conduct of the judge or the judge's personal circumstances that is in question and not the conduct of a third party.

With these standards guiding me, I conclude that in determining when to recuse from a proceeding under Texas Rule of Civil Procedure 18b(2)(a), I would ask whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. This standard is generally consistent with the approach of Justice Osborn, who favored the Kansas "reasonable person on the street" test in an opinion he wrote while Chief Justice of the El Paso Court of Appeals. *See Aguilar,* 855 S.W.2d at 805 (Osborn, C.J., concurring). In that case, he explained:

> After all[,] the impartial standard [of Rule 18b(2)(a) ] has been adopted in order that the public, i.e., the person on the street, might have confidence in the judiciary and

to protect judges from unjustified complaints about their being partial in their decision.

*Id.* at 804–05. Because this test requires courts to evaluate a motion to recuse from a disinterested observer's point of view, it seems best suited to achieve the primary purpose of Rule 18b(2)(a): avoiding the appearance of judicial bias. A standard that assumes the perspective of the judge, an attorney or a litigant involved in the case would not do much to satisfy the purpose of the rule. As one court has noted:

> [Although courts try to] make an external reference to the reasonable person, it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.

*In re Mason,* 916 F.2d 384, 386 (7th Cir. 1990).

## IV.

Under the test I apply, a judge would not recuse himself or herself merely because others had engaged in normal, even vigorous, campaign activities. The TEX–PAC video praises some justices, criticizes others, and predicts dire consequences—even as to a specific case—if its chosen candidates do not prevail. It is campaigning of the most raw sort, but it is, after all, campaigning. Any citizen or group that chooses to participate in the political process must be free to support or oppose those seeking office with unrestrained vigor. Citizens' political speech would be unacceptably regulated if they had to fear that their efforts in support of a

political candidate, even for judicial office, would remove that candidate from his or her official duties if elected. *See generally Buckley v. Valeo,* 424 U.S. 1, 25–28, 96 S.Ct. 612, 637–39, 46 L.Ed.2d 659 (1976). The portrayal of some candidates as "good" and others as "bad," even in the graphic, pointed analogy of Luke Skywalker versus Darth Vader, is merely the rough and tumble of the democratic process. Regrettably the rough and tumble includes judicial elections.[1] The citizens of this State who, through their selected form of governance, subject judges to this wide-open process could not reasonably expect a judge to recuse because of the judge's exposure to that process.

Nor should any justice recuse because the TEX–PAC video seeks to raise campaign funds, directly or indirectly, to support or contest the election of justices to this Court. However much I personally deplore the current system under which Texas judges are selected, *see* Enoch, Foreword to *1995 Annual Survey of Texas Law,* 48 S.M.U.L.REV. 723 (1995) (discussing problems of politicization of the judiciary), I recognize that a reasonable person must accept the realities of that system. As Chief Justice Osborn explained:

> [A] "reasonable" person must be aware of the "facts of life" which surround the judiciary. In states which elect judges, the "reasonable" person must know that judges have to stand for election on a regular basis, that elections cost money and that in metropolitan areas and in state-wide races those races are very expensive for an effective campaign. [Citation omitted.] ... We might even expect

---

1. Of the 485 judges currently sitting on state trial or appellate benches, 345 have been opposed in one or more primary or general elections. TEXAS OFFICE OF COURT ADMINISTRATION, ELECTORAL HISTORY OF TEXAS JUDGES (1995). No justice of this Court has been unopposed since 1984. And although no sitting justice of this Court was defeated until 1920, *see Dallas Morning News v. Fifth Court of Appeals,* 842 S.W.2d 655, 662 (Tex.1992) (Phillips, C.J., separate opinion), five of the eleven justices who sought to retain their office by election between 1986 and 1992 were unsuccessful; another justice left office when, at the end of his term, he was defeated in his effort to unseat

Chief Justice Phillips, and two other justices chose not to seek re-election. Since 1988, over fifty million dollars has been raised to finance Texas appellate judicial elections. TEXAS OFFICE OF COURT ADMINISTRATION, TEXAS APPELLATE JUDICIAL CANDIDATES CAMPAIGN AND ELECTION REPORT 1 (1995). In 1994, more money was spent campaigning for a single seat on the Supreme Court of Texas than for any other state-wide elected position except for Governor and Lieutenant Governor. AUSTIN AMERICAN STATESMAN, Feb. 18, 1995, at B3.

the "reasonable" person to have some knowledge as to the motives for contributing to a judicial campaign. [Citation omitted.]

*Aguilar,* 855 S.W.2d at 805 (Osborn, C.J., concurring).

A reasonable person would know that only an informed electorate can be counted on to make intelligent choices, and that most of that information must come through the campaign process. I would expect the reasonable person to know that both fundraising and grass-roots support will come largely from those who are interested, financially or otherwise, in the work of the courts. I do not mean to suggest that circumstances could never arise, or have not already arisen, where the nature and timing of a campaign contribution to the judge would be so unusually questionable as to require recusal under Rule 18b(2)(a). But such is not the case here.

For similar reasons, TEX–PAC's requests for personal involvement do not implicate recusal. As the video notes, many members of the medical profession have taken an active role in court races in recent years. As long as judges are subject to any electoral process, our rules must be construed to encourage citizen involvement, not to chill it.

Nor can mere appearances in the TEX–PAC video lead to recusal. A reasonable person would know that, as candidates, we appear in public fora at which audio and video recordings are allowed, if not encouraged. I would expect the reasonable person to know that not only local and perhaps national news organizations, but various politically active organizations will excerpt portions of these recordings for their own use. Unilateral actions by an enthusiastic, politically active group cannot justify a reasonable expectation that the candidates it targets either for support or opposition would be biased.

Additionally, I reject Rogers and the Howell's estate's assertion that appearances by justices in campaign videos, standing alone, cast doubt in the mind of a reasonable person about the judges' ability to be fair and impartial. The justices' statements in the TEX–PAC video speak for themselves. Nothing there implicates recusal. Specifically, there is no promise either of a particular result nor an endorsement of any other candidate or issue. Tex.Code of Jud.Conduct, Canon 5. I expect a reasonable person to know that judges will be called upon in the course of their regular activities to make remarks about the importance of continuing citizen involvement in the political process. We are, after all, required to compete in that political process.

## V.

Although not challenged in the motion to recuse, Justice Gammage recuses. As is obvious from the above discussion I see no basis for his action. What makes his recusal noteworthy, beyond merely his issuing a "declaration," is the reasoning he uses. Following his reasoning, which is based solely upon the political speech of a third party, all nine of the current Supreme Court justices would have to recuse simply because TEX–PAC was too pointed in its campaigning for the candidates of its choice. This is so because TEX–PAC has endorsed or challenged every sitting justice currently on the Court. Under Justice Gammage's reasoning, recusal would be required even though there is no questionable conduct on the part of the judge, but solely because third parties tied their political efforts to the outcome of a particular case. While I consider such third party activities to be troublesome, and I fear growing acceptance of this type of campaigning bodes ill for the traditional notion of an independent judiciary, *see generally* Enoch, 48 S.M.U. L. REV. at 723, it cannot affect recusal. A reasonable person would know that campaign supporters have motives for their support. *Aguilar,* 855 S.W.2d at 805 (Osborn, C.J., concurring). But a reasonable person cannot, without more, be justified in doubting the impartiality of the tribunal. Justice Gammage's reasoning would totally disrupt the efficient administration of justice

in Texas. His standard for recusal would be wholly unworkable. Under his reasoning, only judges who faced no election opposition would be able to fully perform the functions of their office. Judges who defeated well-financed election opposition with strong broad-based support would be virtually removed from the duties of the office to which they were elected. And this occurs merely because of the "tenor" of what the supporter says. 909 S.W.2d 874. Justice Gammage's standard, it seems to me, would permit even "conclusory statements, conjecture, and innuendo" to suffice, a standard rejected even by the deferential holding of the Colorado Supreme Court. *Zoline*, 732 P.2d at 639. To the contrary, "the Constitution does not contemplate that judicial machinery shall stop." *Sun Oil*, 483 S.W.2d at 823 (citing to *Hidalgo County Water Control and Improvement Dist. No. 1 v. Boysen*, 354 S.W.2d 420, 423 (Tex.Civ.App.—San Antonio 1962, writ ref'd)).

While the case today involves the conduct of TEX–PAC, this case could as easily involve the Texas Abortion Rights Action League PAC, identified as "The Political Arm of the Pro–Choice Movement." Historically that organization has solicited votes for judicial candidates that it has endorsed. One of its more recent mailings urged the voter to "VOTE PRO–CHOICE" and then listed its two endorsed candidates for the Texas Supreme Court. While neither of these candidates won the election, they are both respected jurists, who still serve the citizens of this state as active sitting justices on their respective courts of appeals. Under my view, their recusal in cases involving abortion clinics just because of this mailing is not appropriate. *See, e.g., Ex Parte Tucci*, 859 S.W.2d 1 (Tex.1993). Under Justice Gammage's view, their recusal is required.

&ast; &ast; &ast; &ast; &ast; &ast;

I conclude with a final comment. I am not critical of those who raise money for and campaign on behalf of judicial candidates. Those parties should be commended for their involvement in the political process. The vice lies rather in the Texas judicial selection system, which places intolerable tensions between the process by which judges are chosen and the obligations they must discharge once in office. This Court has unanimously supported efforts to reform judicial elections in Texas. It is the Texas Legislature that has failed to respond, and judges in this State continue to be faced with partisan contested election campaigns. To establish recusal as proper under the facts of this case would seriously jeopardize their ability to perform the duties of their office. For candidates and their supporters alike, the fine line of conducting a campaign which draws public interest and attention without eroding public confidence in judicial neutrality is hard to hew. But, as we expect citizens to be knowledgeable about the political realities of judicial elections, we must expect them to know where that line should be drawn.