

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00197-CR

_____

ROY DEAN DUFFEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1222696

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

Roy Dean Duffey and David Harrison Cooper had an altercation on February 20, 2011, during which Cooper was stabbed to death. A time lapse occurred, but Duffey was eventually indicted for the murder of Cooper. The matter was set for jury selection Tuesday, July 3, 2012, and on that date, Duffey and the State entered into a plea agreement wherein Duffey entered a plea of guilty to the reduced charge of manslaughter with an agreed punishment recommendation of ten years' imprisonment on the condition that Duffey would receive "shock probation."[1] The trial court accepted Duffey's plea of guilty and reset the formal sentencing hearing for July 9.

However, the judge presiding in that matter engaged in a brief, unscheduled ex parte meeting with members of Cooper's family and others associated with them the following Thursday, July 5. On that same date, the State filed a motion to continue the sentencing hearing on the basis that representatives of the State had met with Cooper's family and had received "the possibility of evidence that could affect its decision or the Court's decision to accept or reject the agreement offered to the Court." This motion for continuance was set for hearing July 9, the same day previously set for sentencing. After hearing the State's motion for continuance, the sentencing hearing was continued until July 23, 2012. Even so, the court notified the parties July 19 by electronic message that he would reject the previously-announced plea agreement. The judge's announcement prompted Duffey to file a motion to recuse[2] the judge, citing the fact

---

[1]Although the term "probation" has been supplanted in statute by "community supervision," we employ the use of the term "shock probation" here because it is something of a term of art.

[2]Although the motion identified itself as a motion to disqualify the judge, the parties agreed that the relief being sought was actually to recuse the trial judge. The judge hearing the motion and both parties agreed to a trial amendment of the motion to be one for recusal, not disqualification.

that the judge had engaged in an ex parte meeting with members of the victim's family and others associated with them, thereby influencing or prompting his decision to reject the plea agreement. The presiding judge refused to disqualify himself and the Honorable John Ovard, the administrative judge of the region, presided over the resulting hearing. Although Duffey subpoenaed the trial judge to testify, Judge Ovard quashed that subpoena. After hearing testimony and the arguments of the parties, Ovard denied Duffey's motion to recuse.

Subsequently, Duffey entered an open plea of guilty to manslaughter[3] and submitted the issue of punishment to a jury. The jury rejected Duffey's request for community supervision and sentenced him to twelve years' confinement.

On appeal, Duffey argues that (1) the trial court abused its discretion when it received ex parte evidence and refused to honor the previously accepted plea agreement, (2) Judge Ovard abused his discretion by denying Duffey's motion to recuse, and (3) the trial court erred by failing to grant his various motions for mistrials.

We reverse Judge Ovard's order denying Duffey's motion to recuse the trial judge and remand the case for a new trial.

## I.    Procedural and Factual Background

According to the testimony of several witnesses, on February 20, 2011, a verbal altercation occurred between Duffey and Cooper in Sulphur Springs, Hopkins County, Texas, when Cooper taunted Duffey (who was armed with a knife), this initial struggle terminating with

---

[3]Pursuant to the plea agreement, the State dropped the remaining charges.

Duffey demonstrating that he was armed and had the upper hand. After they parted, Cooper resumed taunting Duffey, the two re-engaged their fight, and Cooper was fatally stabbed.

As previously stated, when the litigants prepared to select a jury July 3, 2012, they reached accord on a plea agreement whereby Duffey entered a plea of guilty to the reduced charge of manslaughter with an agreed punishment recommendation of ten years' incarceration on the condition that Duffey would receive shock probation. During the plea hearing, the trial court accepted Duffey's plea of guilty, making it plain that Duffey would thereafter be unable to withdraw that plea of guilty. The trial court remarked,

> You've entered a plea of guilty, and your attorneys -- I mean, they've got you a great deal here, probably. If you committed manslaughter, you've got a very good opportunity. The question is -- you've told me you had, so the Court will find you guilty next Monday and sentence you and then plan to bring you back before Christmas [pursuant to the shock probation]. That's -- that's the plan.
>
> . . . .
>
> Regarding concerns that Duffey may have to deal with the trial court's possible successor in office at the shock probation hearing] If – and, as far as I'm concerned, if I'm alive, I will get [Duffey] here before the end of the year.

The trial court then granted the State's request to reset the formal sentencing hearing for July 9 so that the State could meet with the victim's family to inform them of the content of the plea agreement. After the hearing, the trial judge then texted the assistant editor of the local newspaper, informing him of the content of the plea agreement that had been reached and telling the newsman "the sentencing that would go with that." That same day, the content of the plea agreement was published in the local newspaper, noting that Duffey was to serve 180 days in

4

prison as shock probation and then would be subject to community supervision for a period of ten years.

The newsman, Kerry Craig, testified that about 8:00 a.m., two days after the publication of the news story, he saw a group of people (including the victim's mother and father, Patricia and David Cooper, Carolyn Thomas,[4] and LaVelle Hendricks[5]) at the Titus County courthouse. The group and the newsman all walked into the trial judge's office,[6] and "the group told him they would like to talk with him." At the trial judge's suggestion, they relocated to the jury room where they would have "some room to talk." At that point, the newsman was informed that the parties intended to have a private meeting to which he was not invited.[7] Because he did not remain, he was unaware of the content of the ensuing discussion.

Hendricks, pastor of East Caney Baptist Church, knew the Cooper family and had a relationship with them because of his professional activities. Hendricks had gone to the courthouse on that day because he had learned that a vigil was scheduled to be held there at 8:30 that morning. He testified,

> For the most part, there's not an elected official in Hopkins County that doesn't know me. . . . I make it my point to know elected officials, to know everyone, because, contrary to what people might think or believe, folks in church do get in trouble, and I need to have access to people that have influence.

---

[4]Thomas did not testify during the recusal hearing.

[5]Although Craig testified that he believed Harold Nash was also present, Nash testified otherwise.

[6]The newspaper reporter heard on the local radio station that the Cooper family intended to meet with the trial judge, so he went to the courthouse to "cover the meeting or find out . . . what was going on." The radio broadcast also said there would be "another gathering that evening or subsequent evening on the square."

[7]The reporter was unable to remember who told him this, but he indicated that the trial judge was not the source.

Although the group entered the courthouse that morning searching for the district attorney,[8] they encountered the trial judge exiting his office and asked for the opportunity to speak with him. As to the contents of the meeting, Hendricks testified,

> And so we went into some room here in the building, and the discussion came about as to what in the heck is going on, to which Judge Newsom said, I can't discuss it. He said, I must remain impartial at all times; I can't discuss it.
>
> Well, when you've got five or six people who are closely related to all of the happenings going on, I think the questions kept going on, well, Judge Newsom, why can't you do anything? And he just kept saying, I can't discuss this; I can't discuss this.

During this meeting, Hendricks, the Coopers, and those with them complained of the sentence they had heard that Duffey was to receive, indicating their mutual disappointment while the trial judge listened to those complaints. Although the trial judge met with the group, he consistently told them that he could not "discuss anything associated with this case" and did not reveal to the group what he intended to do in regard to the objections being voiced about the plea agreement as announced.

The mother of the victim, Patricia Cooper, testified that during the group's meeting with the trial judge, they were repeatedly told by the trial judge that he could not speak with any of them concerning the case and that the district attorney was the person to whom they should direct their questions. Mrs. Cooper went on to relate that Hendricks and Thomas did most of the talking during the meeting and that "the only thing [the group] asked [the trial judge] was about what was in that paper . . . the fact that a plea deal had been reached." Mrs. Cooper's primary

---

[8]Although the district attorney's office is not located in the courthouse, the group thought they might find him there.

6

concern was that she was "completely out of the loop" because the family had not been consulted prior to the plea agreement being reached.

David Cooper, the victim's father, was also present for the meeting with the trial judge. It was his understanding that they were there to complain about the way the plea agreement had been handled, and he reiterated that the trial judge had only told the group that "he couldn't discuss the case." David continued, "That's basically what he said. And we, yada, yada. And he said, well, nothing -- I can't discuss it. He got up. He left out." During David's testimony, the following exchange took place:

> Q.    Mr. Cooper, everyone there was expressing concern that Duffey didn't get enough punishment. Isn't that the truth?
>
> A.    Yes. I would say so. But like I say, I can't know what's going on in their head, you know . . . .

According to Hendricks, the meeting lasted only about "seven, eight, nine minutes."[9] According to David, Hendricks led everyone, including the trial judge, in a prayer for justice, and Hendricks indicated that the trial judge concluded the meeting by rising, informing the group that he had to be somewhere else quite shortly, and leaving the room. Hendricks said that he had no other communication with the trial judge regarding the case other than to send him a text message (to which the trial judge did not respond) saying, in part, "[T]his whole stuff is a mess; I hope that something can be done to fix all this stuff."

The day after the trial judge's July 5 meeting with the Cooper group, the State filed a motion to continue the previously-scheduled sentencing hearing in order to investigate "the

---

[9]Patricia Cooper testified that the meeting lasted anywhere from five to ten minutes, but David remembered the meeting lasting only two minutes.

7

possibility of evidence that could affect . . . the Court's decision to accept or reject the agreement offered to the Court." The parties entered an agreed order resetting the sentencing hearing for July 23, but on July 19, the trial judge informed the State and Duffey's counsel electronically that he intended to reject the plea agreement as announced.

At the recusal hearing, the newsman testified that less than a week after the July 5 meeting between the Cooper group and the trial judge, but before the date the trial judge informed the parties of his intent to reject the plea agreement, he and the attorneys in the case were all present for a conference in the trial judge's chambers. The purpose of this conference was to discuss whether the judge's meeting with the Coopers "was something that should have happened or not, with the suggestion that [the trial judge] should consider stepping down from the case." The newsman opined that the impression that he drew from the meeting was that the trial judge did not intend to recuse himself, even though the judge never said that he would not.

Based on the fact that the trial judge had engaged in an ex parte meeting with the Cooper group, Duffey filed a motion to recuse that judge, resulting in the hearing held by Judge John Ovard, the presiding judge of the judicial region. After having first quashed Duffey's subpoena of the trial judge and after hearing testimony and the arguments of the parties, Ovard denied the motion to recuse. Subsequently, Duffey entered an open plea of guilty to a charge of manslaughter, asking a jury to set punishment. The jury rejected Duffey's request for community supervision and sentenced him to twelve years' confinement.

8

## II. Analysis

### A. Did the Assigned Judge Err by denying Duffey's Motion to Recuse?

As Duffey's second point of error is dispositive of the case, we address it first. In his second point of error, Duffey contends that Judge Ovard should have granted his motion to recuse the trial judge.

Even in criminal cases, Rule 18a of the Texas Rules of Civil Procedure applies to the recusal of judges, "absent 'any explicit or implicit legislative intent indicating otherwise.'" *Ex parte Sinegar*, 324 S.W.3d 578, 581 (Tex. Crim. App. 2010) (quoting *Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993)). A motion to recuse a judge "must assert one or more of the grounds listed in Rule 18b." TEX. R. CIV. P. 18a(a)(2). Among other things, a judge must be recused in any proceeding in which "the judge's impartiality might reasonably be questioned," TEX. R. CIV. P. 18b(b)(1), or the judge "has a personal bias or prejudice concerning the subject matter or a party; . . . [or] personal knowledge of disputed evidentiary facts concerning the proceedings," TEX. R. CIV. P. 18b(b)(2).

A motion to recuse seeks to prevent a judge from hearing a case because of a nonconstitutional reason. Even if a motion to recuse is procedurally defective, he must refer the motion so another judge can determine the merits of the motion to recuse if the judge does not then voluntarily recuse himself. *See McLeod v. Harris*, 582 S.W.2d 772, 775 (Tex. 1979); *Jamilah v. Bass*, 862 S.W.2d 201, 203 (Tex. App.—Houston [14th Dist.] 1993, orig. proceeding). Here, the trial judge properly referred the motion to recuse for hearing by another judge. Judge Ovard (who appointed himself to conduct that hearing) denied the recusal.

9

We review the denial of a motion to recuse for abuse of discretion. TEX. R. CIV. P. 18a(f); *Vickery v. Vickery*, 999 S.W.2d 342, 349 (Tex. 1999) (op. on reh'g); *McElwee v. McElwee*, 911 S.W.2d 182, 185 (Tex. App.—Houston [1st Dist.] 1995, writ denied). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the court acted without reference to any guiding rules or principles. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge does not demonstrate such an abuse. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 242 (Tex. 1985).

We apply a reasonable person standard in determining whether a recusal motion should have been granted. *See Woodruff v. Wright*, 51 S.W.3d 727, 736 (Tex. App.—Texarkana 2001, pet. denied). The question is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. *Rogers v. Bradley*, 909 S.W.2d 872, 881 (Tex. 1995). The impartiality standard set out in Rule 18b(2)(a) has been adopted in order that the public (i.e., the person on the street) might have confidence in the judiciary and to protect judges from unjustified complaints about their being partial in their decisions. *Id.* at 881–82.

Federal rules regarding recusal of judges are governed by statute and contain some language similar to that employed by Texas. Specifically, federal law mandates that a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be

10

questioned." 28 U.S.C.A. § 455 (West, Westlaw current through 2013). Perhaps because of this similarity, Texas courts often look to federal recusal opinions for additional guidance.[10]

For instance, in *Hall v. Small Business Administration*, 695 F.2d 175 (5th Cir. 1983), the losing party moved, after trial, to disqualify the judge and to vacate the judgment because it came to light that the judge's law clerk had, among other things, accepted, before the judgment was rendered, an offer to join the law firm which represented the winning party. *Id.* at 178. Even though (1) the trial judge was unaware of the job offer at the time the ruling was made, (2) the clerk had never told the trial judge his opinion of the case, and (3) despite the fact that the trial judge had already determined the crux of his ruling before he learned of his clerk's future employment, the Fifth Circuit ruled that disqualification was required. In doing so, the appellate court remarked that because the goal of the statute was to "exact the appearance of impartiality," it was, in the court's opinion, immaterial "[w]hether or not the law clerk actually affected the judge's decision." *Id.* at 178–79.

Likewise, in *In re Kensington International, Ltd.*, 368 F.3d 289 (3d Cir. 2004) (orig. proceeding), a federal district judge appointed five advisers (lawyers, retired state court judges, and professors with experience in asbestosis or mass tort litigation) to assist him in a complex bankruptcy case, which consisted of five consolidated asbestos company bankruptcies. *Id.* at 295–96. Several of the asbestos-related companies involved in the bankruptcy moved to disqualify the judge on the ground that the advisers were interested in the litigation and the

---

[10]*Rogers*, 909 S.W.2d at 880; *Kniatt v. State*, 239 S.W.3d 910, 916 (Tex. App.—Waco 2007); *In re K.E.M.*, 89 S.W.3d 814, 822 (Tex. App.—Corpus Christi 2002, no pet.); *Ludlow v. DeBerry*, 959 S.W.2d 265, 282 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (op. on reh'g); *Monroe v. Blackmon*, 946 S.W.2d 533, 537 (Tex. App.—Corpus Christi 1997); *Keene Corp. v. Rogers*, 863 S.W.2d 168, 182 (Tex. App.—Texarkana 1993, no pet.) (op. on reh'g).

judge's reliance on them put his impartiality in question. *Id*. at 299. As a part of its analysis, the Third Court of Appeals ruled that a reasonable person, with familiarity of the circumstances, would conclude that an existing conflict of interest on the part of some of the advisers (which was found to exist) tainted the judge. *Id*. at 309.

In the case of *Mosely v. State*, 141 S.W.3d 816 (Tex. App.—Texarkana 2004, pet. ref'd), Mosley moved to recuse the trial judge. The motion to recuse was denied by the judge assigned to hear the motion. *Id.* at 831–32. Mosley then hired the original trial judge's son to represent him, prompting the original trial judge to recuse himself. At that point, another local judge was assigned to preside over the case. *Id.* at 832. On the first day of trial, Mosley filed a motion for continuance (his third), and in his ruling denying the motion, the successor judge noted that he discussed the motion with the original judge. *Id.* After the trial, Mosley filed a motion for new trial based, in part, on the denial of his motion for continuance and the communication that took place between the original judge and his successor. At the same time, he filed a motion to recuse the successor judge from hearing his motion for new trial. An entirely different judge from all those mentioned heretofore was assigned to hear this latest recusal motion, and after a hearing, denied it.

On appeal, Mosley argued that by denying his motion to recuse the successor judge, the judge assigned to hear the motion abused his discretion. He took this position because the successor judge's impartiality was reasonably in question due to his alleged "improper conduct in deferring his adjudicative responsibility to [the original judge] on the motion for continuance" and that a reasonable person would suspect the successor judge of being similarly motivated by

12

these extrajudicial forces to deny his motion for new trial. *Id.* at 834. However, Mosley differed from the federal cases cited above in that the meetings between the original judge and the successor judge were not ex parte; rather, attorneys for both sides were present and had an opportunity to hear the communications between the two judges. Further, the meeting between the two judges was to discuss only scheduling and other administrative matters, not substantive issues of the case.

At the plea hearing in the case now before this Court, the trial judge reviewed the details of the plea agreement with Duffey and the State, accepted Duffey's plea, and (by the judge's statements) gave every indication to all in attendance that he would accept the plea agreement as announced at a subsequent sentencing hearing, which was set to occur just a few days later.

Here, it is undisputed that the trial judge's meeting with the Cooper family group was conducted ex parte. The meeting was not on the record, no attorney for either side was present, and as the trial judge did not testify at the recusal hearing,[11] we have only the word of the other attendees of the meeting pertaining to the discussions during that meeting. Their testimony concurred with one another that the trial judge properly told them that he could not discuss the case with the attendees and that they should speak to the district attorney about the gist of their complaints. However, their testimony also confirms that during this meeting, the trial judge listened to their concerns over and objections to the plea agreement and joined with them in a prayer for justice in the matter.

---

[11]Had the subpoena of the trial judge not been quashed, he may have had the opportunity to confirm the content of the ex parte discussion and, further, to assure that nothing that took place at that meeting influenced his decision to reject the plea agreement.

13

Taking all of this into account, we find that a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt as to the trial judge's impartiality in this case, and therefore we sustain this point of error.[12]

**B.      Harm Analysis**

The failure to recuse a judge because his impartiality might reasonably be questioned is subject to a harm analysis. *Mosley*, 141 S.W.3d at 837. We examine (1) the risk of injustice to the parties in the particular case, (2) the risk that denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

The risk of injustice to the parties in this particular case is significant. The meeting at issue was undeniably ex parte, and the Cooper group was composed of interested parties expressing their unhappiness with the as yet unapproved plea agreement. Two days before the ex parte meeting (when Duffey entered his guilty plea), the trial judge strongly indicated he would approve the plea agreement. Two weeks after that meeting—just days before Duffey was scheduled to be officially sentenced—the trial judge notified counsel for both sides that he would reject the plea agreement. After having the jury assess punishment, Duffey's fate went from six months of confinement under shock probation followed by ten years of standard community supervision to a jury-imposed sentence of twelve years' incarceration.

---

[12]We also note that the justices of this Court are very familiar with the trial judge and his unquestioned integrity while on the bench. However, because we are in a position that is different from citizens outside the judiciary, we recognize that the "man on the street" would likely not have the same opportunity as we to gauge that integrity.

14

While the recusal testimony indicates that the trial judge refused to discuss the details of the case during the ex parte meeting, he clearly listened to the concerns and objections of the Coopers and Hendricks regarding a sentencing decision that was not yet final. Allowing this trial judge, even if he were to sit mute, to meet privately with a crime victim's family and pastor regarding sentencing and unfinalized plea agreements would create a dangerous precedent that could produce injustice in other cases. Characterizing this behavior by a jurist as harmless would undermine public confidence in the judicial system.

Accordingly, we reverse the trial court's judgment and remand the case for a new trial by a different judge.

Bailey C. Moseley
Justice

Date Submitted:    January 27, 2014
Date Decided:    February 21, 2014

Publish