GARTH, Circuit Judge.
Approximately six months ago, two emergency petitions were filed in this Court asking us to issue Writs of Mandamus disqualifying Senior District Court Judge Alfred M. Wolin of the District of New Jersey from continuing to preside over two of five asbestos-related bankruptcies that this Court had assigned to him in December 2001 for coordinated case management. The five companies in bankruptcy are Owens Coming, W.R. Grace & Co., USG Corporation, Armstrong World Industries, Inc., and Federal-Mogul Global, Ine, (collectively, the “Five Asbestos Cases”).
The Petitions, which were brought by creditors of Owens Coming and W.R. Grace & Co., alleged that Judge Wolin had, through his association with certain consulting Advisors which he had appointed, created a perception that his impartiality “might reasonably be questioned” under 28 U.S.C. § 455(a). The Petitions asserted that disqualification was also warranted under 28 U.S.C. § 455(b)(1) as a result of ex parte communications among Judge Wolin and his advisors, the parties, and the attorneys.[1]
Following a hearing on December 12, 2003, we concluded that we should not reach the merits of the Mandamus Petitions. Our decision was “prompted by our overarching concern that we [did] not have an adequately developed evidentiary record before us.” In re Kensington Int’l Ltd.,, 353 F.3d 211, 214 (3d Cir.2003). “[RJeluctant to act in a complex situation such as this one, where so many vital interests are at stake, without a developed evidentiary record,” we remanded the proceedings to Judge Wolin while retaining jurisdiction. Id. at 223. We instructed Judge Wolin to vacate his order staying discovery and allow expedited discovery to proceed. We also directed that he issue an expedited ruling on all of the recusal motions pending before him. Id. USG Corp. by this time had also filed a recusal motion.
On remand, Judge Wolin and the parties faithfully followed our instructions. Under stringent time restrictions and Judge Wo-liris effective oversight, the parties conducted extensive discovery into the facts surrounding the recusal motions. Follow *294 ing an additional round of briefing, Judge Wolin issued a comprehensive written opinion and order on February 2, 2004 denying the recusal motions both on the merits and on timeliness grounds. See generally In re Owens Corning, 305 B.R. 175 (D.Del.2004).
As noted, we retained jurisdiction over the Mandamus Petitions. These Petitions were joined by USG Corp., the debtor in the USG Corp. bankruptcy. The Official Committee of Unsecured Creditors in the Armstrong World Industries, Inc. bankruptcy filed a fourth Petition, but due to its late filing we did not consolidate it with the other Petitions.
I.
Having exhaustively reviewed the now developed record, we have reached the following conclusions:
First, a reasonable person, knowing all of the relevant circumstances, would conclude that Judge Wolin’s impartiality might reasonably be questioned in the Owens Corning, W.R. Grace & Co. and USG Corp. bankruptcies. Although the record does not demonstrate that Judge Wolin has done anything wrong or unethical or biased, he must be disqualified under 28 U.S.C. § 455(a) from further, presiding over those three bankruptcies. See Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 162 (3d Cir.1993) (“For purposes of § 455(a) disqualification, it does not matter whether the district court judge actually harbors any bias against a party or the party’s counsel.”). We emphasize that our review of the record has not revealed the slightest hint of any actual bias or partisanship by Judge Wolin. On the contrary, Judge Wolin has throughout his stewardship over the Five Asbestos Cases exhibited all of the judicial qualities, ethical conduct, and characteristics emblematic of the most experienced, competent, and distinguished Article III jurists. But the test for disqualification under § 455(a) is not actual bias; it- is the perception of bias. See id.
Second, we find that the motions for recusal in the Owens Corning and W.R. Grace & Co. bankruptcies were timely under 28 U.S.C. § 455(a). In reaching'that conclusion, we disagree with Judge Wolin that it was' appropriate, in this case, to impute knowledge of the grounds for dis-quálification to the Petitioners. The evil that a timeliness requirement is intended to prevent-namely, holding in reserve a recusal demand until such time that a party perceives a strategic advantage-is served by ' requiring actual knowledge; Because the Petitioners did not themselves learn about the Advisors’ conflict of interest (discussed infra) until .shortly before they moved for disqualification, their motions were timely.
Third, USG Corp. stands on a different footing. The record discloses that the USG debtors' and Unsecured Creditors Committee knew as early as January 2002 about the Advisors’' conflict. However, other factors come into play as to USG Corp. (which we discuss infra) requiring Judge Wolin’s disqualification.
Fourth, we do not decide whether the ex parte communications between Judge Wo-lin, on the one hand, and the Advisors, parties, and attorneys, on the other, provide a separate ground for disqualification under 28 U.S.C. § 455(b)(1). Nor do we decide whether those motions are timely. We feel constrained, however, to note that we look with disfavor upon both the extent to which, and manner in which, Judge Wolin engaged in ex parte communications. Whatever value the ex parte meetings may have had in moving the Five Asbestos Cases along or creating a settlement-friendly atmosphere was outweighed *295 by the attendant risks and problems, which are catalogued in some detail in the Petitioners’ briefs. See also Code of Conduct for U.S. Judges Canon 3 § A(4) (2003).
Fifth, we reach no decision on the Petition for Mandamus filed in the Armstrong World Industries, Inc. bankruptcy. As mentioned above,' that Petition was not consolidated with the Petitions in Owens Corning, W.R. Grace & Co., and USG Corp. Rather than delay this opinion, and recognizing that our initial orders dated October 30, 2003 and November 3, 2003 stayed certain proceedings before the Bankruptcy Courts, we will set a separate date to hear argument on the Armstrong Petition and will render a decision in that case in due course.
Sixth, we likewise do not rule on, or express an opinion as to, the fifth bankruptcy, Federal-Mogul Global, Inc., albeit for a different reason. None of the parties in Federal-Mogul has moved for Judge Wolin’s recusal in the Bankruptcy Court or filed a Petition for Mandamus in our Court. Accordingly, we will not disturb Judge Wolin’s assignment in dealing with the Federal-Mogul Global, Inc. bankruptcy-
II. BACKGROUND
In our earlier opinion, we described the parties, the allegations, the responses, the procedures, our standard of review, and our standards for disqualification under 28 U.S.C. § 455(a) and (b)(1). See Kensington, 353 F.3d at 214-22. We perceive no need to repeat these matters in detail, but we will refer to those that are particularly relevant here, as well as the supplemental concerns and facts that have come to our attention.
After our December 12, 2003 hearing, which gave rise to the expedited discovery and Judge Wolin’s expedited ruling on the recusal motions, we received two additional Petitions for a Writ of Mandamus in the USG Corp. and Armstrong World Industries, Inc. bankruptcies. Accordingly, we list the parties now seeking Judge Wolin’s disqualification and those opposing it:
Parties Seeking Recusal[2]
Kensington International Ltd, et al.; Credit Suisse First Boston, as agent for Owens Coming’s pre-petition bank creditors; D.K. Acquisition Partners, L.P., et al.; USG Corp.; Official Committee of Unsecured Creditors of USG Corp.; Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.
Parties Opposing Recusal[3]
Owens Corning; Baron & Budd Claimants; Legal Representative for Future Asbestos Personal Injury Claimants in Owens Corning & USG Corp.; W.R. Grace & Co.; Official Committee of Asbestos Personal Injury Claimants of W.R. Grace & Co.; Official Committee of Asbestos Personal Injury Claimants of USG Corp.
Essentially, the parties seeking disqualification assert that Judge Wolin had appointed five Advisors to assist him in the discharge of his functions. These Advisors were not selected from any judicial category (i.e., they were not federal magistrate judges, special masters, or law clerks[4]); *296 they consisted of lawyers, retired state court judges, and professors with prior experience in asbestos litigation. The Petitioners claim that Judge Wolin, who has presided over the Five Asbestos Cases since December 2001, has through his appointment of the Advisors and his participation with them in administering the bankruptcies, created a perception in the mind of the reasonable person that his impartiality could be questioned, and this being so, that he must be disqualified.
The Petitions filed in the Owens Corning and W.R. Grace & Co. bankruptcies seek Judge Wolin’s disqualification primarily pursuant to 28 U.S.C. § 455(a), which reads: “Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. ” As we stated in our earlier opinion, “[t]he test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge’s impartiality might reasonably be questioned.” Kensington, 353 F.3d at 220 (citing Edelstein v. Wilentz, 812 F.2d 128 (3d Cir.1987)). While this test is acknowledged to be the standard for disqualification under § 455(a), the interpretation of what constitutes a reasonable person has been contested here. We will discuss that issue later in this opinion.
After we scheduled the briefing and hearing dates for the Owens Corning and W.R. Grace & Co. Petitions, USG Corp. filed a third Petition for Mandamus. That Petition, while also seeking disqualification pursuant to § 455(a), focused primarily on the standard of disqualification found in § 455(b)(1). That particular subsection requires a justice, judge, or magistrate judge to disqualify himself only if “he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.” 28 U.S.C. § 455(b)(1). The thrust of USG Corp.’s Petition is that Judge Wo-lin acquired personal knowledge of disputed evidentiary facts by conducting ex parte meetings with the Advisors, parties, and attorneys.
More recently, the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc. (the “Armstrong Committee”) also filed a Petition for a Writ of Mandamus. That Petition neither seeks nor opposes Judge Wolin’s disqualification. Instead, it asks that we extend to the Armstrong bankruptcy whatever relief, if any, we apply to the Owens Corning, W.R. Grace, and USG Corp. bankruptcies.
To complete our recital of the matters we must consider, we note that the parties in the Federal-Mogul Global, Inc. bankruptcy, which is the fifth asbestos-related bankruptcy under Judge Wolin’s charge, have not participated in any of the proceedings which we review.[5]
Even though we described the facts in some detail in our earlier opinion, certain factual circumstances require further elaboration here because they bear directly on the merits and timeliness of the petitions.
A. The Parties
The first petition was filed by Kensing-ton International Limited and Springfield *297 Associates, LLC, two creditors of Owens Corning (collectively, “Kensington”). That petition was followed in short order by a second petition from D.K. Acquisition Partners, L.P., Fernwood Associates, L.P., and Deutsche Bank Trust Company Americas, three creditors of W.R. Grace & Co. (collectively, “D.K. Acquisition Partners”). The third petition was filed more recently by USG Corporation, the debtor in the USG bankruptcy.
B. Ex Parte Communications and the Advisors
On December 20, 2001, Judge Wolin held a case management conference for the Five Asbestos Cases. Although there is no official record of what was said at that conference, Judge Wolin produced a script (“talking points”) which reflects what he said to the parties. According to the script, Judge Wolin announced that “[i]n order to effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an ex parte basis, without permission of adversary attorneys.” Judge Wolin further announced that “[a]ny objection to such ex parte communications is deemed waived,” but he assured the parties and attorneys that he would use his power to meet ex parte “sparingly.” None of the parties objected at that time.
A week later, Judge Wolin named five “Court Appointed Consultants” (the “Ad-visors”) to assist him in the Five Asbestos Cases. The five individuals he named were David Gross, Judson Hamlin, William Dreier, John Keefe, and Francis McGovern, all of whom had prior experience with asbestos or mass tort litigation either as state court judges, private practitioners, or academics. Pursuant to Judge Wolin’s order, the Advisors were to “advise the Court and to undertake such responsibilities, including ... mediation of disputes, holding case management conferences, and consultation with counsel, as the Court may delegate to them individually.” The Advisors could also be delegated “certain authority to hear matters and to advise the Court on issues that may arise in these five large Chapter 11 cases.” Judge Wo-lin’s order provided that he could, “without further notice, appoint any of the Courts Appointed Consultants to act as a Special Master to hear any disputed matter and to make a report and recommendation to the Court on the disposition of such matter.”
Over the next two years, Judge Wolin met repeatedly, on an ex parte basis, with the parties and their attorneys. Despite his prior assurance that he would do so “sparingly,” he acknowledged more recently that he met ex parte with interested parties “on innumerable occasions.” (Supp. Resp. dated Nov. 20, 2003). This is supported by the fee applications filed by the Advisors, which reveal more than 325 hours of ex parte meetings with the attorneys for various parties in the Five Asbestos Cases. Many of these meetings took place at restaurants over lunch or dinner or at law firms. During the proceedings on remand, Judge Wolin acknowledged that he received extra-judicial information at the ex parte conferences. (See Joint Appendix “JA” at 1165.)
The ex parte meetings were not limited to the parties and their attorneys. In the first half of 2002, Judge Wolin and the Advisors held a series of four ex parte meetings at which they discussed, in Ad-visor McGovern’s words, “[jjust whatever issue you can think of,” including claims bar dates, the chrysotile defense,[6] proof of *298 claim forms, pleural plaques,[7] the pros and cons of various approaches to estimation under 11 U.S.C. § 502(c),[8] the tensions between various creditor classes, and Rule 706 panels.[9] These issues are highly relevant concerns in asbestos litigation. The primary purpose of these meetings was to educate Judge Wolin on the issues likely to arise in the Five Asbestos Cases or, as Advisor Gross put it, “to assist Judge Wo-lin ... in becoming more conversant with the details of the asbestos litigation.”
One of these initial meetings was attended by Bob Komitor, a plaintiffs attorney. According to Advisor Dreier, Komitor described an expert, Dr. Peter Barrett, as “a charlatan” and criticized the chrysotile defense. Dr. Barrett had been previously engaged by USG Corp. While there is no official record of this meeting, notes taken by Advisor Gross suggest that some of the Advisors also expressed negative views about the positions taken by USG’s expert and other USG Corp. defenses.
Following this series of initial meetings, Judge Wolin also held an ex parte meeting on November 19, 2002 with Advisors Gross, McGovern and Dreier to discuss certain issues in the Owens Corning bankruptcy. There is no official transcript of this meeting, but Advisor Dreier took notes. On remand, Judge Wolin rejected inquiries concerning this meeting on the ground that it included settlement discussions. As a result, Advisor Dreier’s notes were filed under seal both in the District Court and by us.
Two days before the meeting, Owens Corning had distributed a draft plan of reorganization that was supported by Credit Suisse First Boston, as agent for the pre-petition creditors. The draft plan called for certain issues to be resolved prior to plan confirmation. At the November 19th meeting, the Advisors discussed some of the key issues contained in the proposed plan with Judge Wolin and explained their effects as well as what appear to be certain settlement figures that had been discussed with the parties.
At a conference held on November 21, 2002, Judge Wolin stated that he did not favor Owens Coming’s proposed plan. In January 2003, Owens Corning filed a revised plan of reorganization that this time was supported by the tort claimants who had objected to the first draft plan.[10]
During the course of the Five Asbestos Cases, Advisor Hamlin prepared a draft opinion in each of the Five Asbestos Cases, *299 a role that Hamlin likened to that of a federal magistrate judge. At his deposition, Hamlin explained that he would normally receive a phone call from Judge Wolin’s chambers informing him that an appeal had been taken from the Bankruptcy Court and that he was to prepare a draft opinion for Judge Wolin. The issues on which he drafted opinions included, among other things, bar dates for asbestos property claims, defenses by USG Corp. to asbestos personal injury claims, and proof of claim forms.
C. The G-I Holdings Bankruptcy
Two months before Judge Wolin appointed the Advisors in the Five Asbestos Cases, the Bankruptcy Court for the District of New Jersey (Chief Judge Rosemary Gambardella) had appointed Advisor Hamlin to serve as the “Legal Representative of Present and Future Holders of Asbestos-Related Demands” in still another asbestos-related bankruptcy case captioned In re G-I Holdings Inc. The G-I Holdings bankruptcy is not related to the Five Asbestos Cases, and Judge Wolin has played no role in the G-I Holdings proceedings. There is, however, a substantial likelihood and a tacit, if not express, agreement that some of the future claimants in G-I Holdings will also have claims against one or more of the debtors in the Five Asbestos Cases.
Less than one month after Judge Wolin appointed the five Advisors, Hamlin filed an application in G-I Holdings to engage Advisor Gross as his local counsel. Chief Judge Gambardella approved Gross as Hamlin’s local counsel.
D. Kensington’s Recusal Motion
Almost two years later, Kensington filed a motion in the Bankruptcy Court seeking to recuse Judge Wolin from further participation in the Owens Corning bankruptcy. Kensington asserted that Judge Wolin was precluded under 28 U.S.C. § 455(a) from continuing to preside over the Owens Corning bankruptcy because two of his Advisors (Gross and Hamlin) allegedly had a conflict of interest as a result of their participation in G-I Holdings.
Three days later, the debtors in the W.R. Grace bankruptcy applied to Bankruptcy Judge Fitzgerald to appoint Mr. Hamlin as the Legal Representative for Future Asbestos Claimants of W.R. Grace & Co. The application disclosed that Mr. Hamlin was already serving as an Advisor to Judge Wolin in the Five Asbestos Cases, including, of course, the W.R. Grace bankruptcy. W.R. Grace & Co. ultimately withdrew its application after Judge Fitzgerald expressed her opinion that Hamlin could not serve as the Futures Representative in the W.R. Grace bankruptcy.
On October 23, 2003, Judge Wolin entered an order staying all discovery in connection with Kensington’s recusal motion. That stay prompted Kensington to file a petition in our Court seeking a Writ of Mandamus directing Judge Wolin either to disqualify himself or to withdraw his discovery stay.

E.The District Court’s Responses

Judge Wolin submitted three written responses to Kensington’s petition. In his first response, dated November 3, 2003, Judge Wolin announced that he would “judge the Motion to Recuse on the law and facts presented after all of the parties have been heard in full” and that he would seek to resolve the motion as quickly as possible.
In his second response, dated November 21, 2003, Judge Wolin answered the suggestion that his ex parte communications with the Advisors and various attorneys somehow required his recusal. Judge Wo- *300 lin explained that the purpose of the ex parte communications “was to ensure that each committee or corporate constituency was afforded the opportunity to provide to the Court insights as to why, in the competition for limited dollars, its claim was just.” Judge Wolin also wrote that, “[g]iv-en that these meetings occurred on a regular basis without complaint and given that the December 20, 2001 case management conference alerted all concerned that ex parte meetings were part of the District Court’s case management plan, it strikes a discordant note that the conduct of ex parte conferences would be the ground for a recusal motion.”[11]
In his third response, dated December 5, 2003, Judge Wolin again defended his Case Management methods and, in particular, his decision to allow ex parte communications.
F. D.K Acquisition Partners’ Mandamus Petition
Meanwhile, D.K. Acquisition Partners filed a motion in the W.R. Grace bankruptcy case seeking Judge Wolin’s recusal. A week later, D.K. Acquisition Partners filed a petition in this Court seeking the same relief requested by Kensington. We consolidated D.K. Acquisition Partners’ Mandamus Petition with Kensington’s Petition.
G. Remand
Following an extended hearing and after we had received briefs from the parties and amici, we remanded the proceedings to Judge Wolin with instructions that he allow expedited discovery to proceed. We also required that he rule on the pending recusal motions. We were motivated primarily by our concern that we did not have an adequately developed evidentiary record before us.
As we previously stated, on February 2, 2004, following expedited discovery, Judge Wolin issued a 102-page written opinion and order denying the motions for recusal. First, Judge Wolin found that the evidence failed to disclose that there was an appearance of impropriety under § 455(a) or that his ex parte communications required his recusal under § 455(b)(1). Second, Judge Wolin determined that the motions were not timely because the parties seeking his recusal either had actual or imputed knowledge of the facts giving rise to the recusal motions long before the motions were filed. He also charged that the Petitions were prompted by strategic, rather than ethical, motivations.
III. JURISDICTION
We have jurisdiction to issue Writs of Mandamus under the All Writs Act, 28 U.S.C. § 1651(a), which provides that “[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.” We also retained jurisdiction when we remanded the proceedings to Judge Wolin for discovery and his ruling. See Kensington, 353 F.3d at 214 (“We will retain jurisdiction over any further proceedings.... ”).
IV. STANDARD OF REVIEW
When a Petition for a Writ of Mandamus challenges a district court judge’s decision not to recuse himself, we *301 normally review that decision for an abuse of discretion. Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 166 (3d Cir.2004). But the mandamus petitions in Owens Corning and W.R. Grace. & Co. are somewhat unique, from a procedural perspective, in that they arrived in our Court before the District Court ruled on the recu-sal motions. Had we reached the merits at that time instead of remanding to the District Court, we would have applied the “clear and indisputable” standard that governs Petitions for a Writ of Mandamus. See Kerr v. U.S. Dist. CL, 426 U.S. 394, 403, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). The abuse of discretion standard, even though it may have led to the same result, would have had no application.
At oral argument, we asked the parties to submit supplemental letters addressing the appropriate standard of review where, as here, a Petition for Mandamus seeking to disqualify a district court judge precedes a ruling by the district court. Having reviewed the submissions made by the parties, we now hold that Judge Wolin’s decision not to recuse himself must be reviewed for an abuse of discretion, as it is, in effect, no different than an appeal from a district court’s order denying recu-sal. See S. Rep. 93-419 (1973), H. Rep. 93-1453 (1974) (explaining that the addition of subsection (a) to § 455 was not intended to alter the abuse of discretion standard of review). ‘When the need for a writ of mandamus is determined by this court to be ‘clear and indisputable,’ a district judge’s decision not to recuse himself or herself necessarily also will have been an abuse of discretion or a clear legal error.”[12] Alexander, 10 F.3d at 163 n. 9.
V. DISCUSSION
A. Standard for Disqualification Under § 155(a)
Whenever a judge’s impartiality “might reasonably be questioned” in a judicial proceeding, 28 U.S.C. § 455(a) requires that the judge disqualify himself. The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge’s impartiality might reasonably be questioned. Alexander, 10 F.3d at 164.
“Under § 455(a), if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge’s impartiality under the applicable standard, then the judge must recuse.” In re Prudential Ins. Co. of America Sales Practices Litigation, 148 F.3d 283, 343 (3d Cir.1998) (internal quotations omitted); see Massachusetts School of Law at Andover, Inc. v. American Bar Ass’n, 107 F.3d 1026, 1042 (3d Cir.1997) (“The standard for recusal is whether an ob *302 jective observer reasonably might question the judge’s impartiality.”).
Selkridge, 360 F.3d at 167.
A party moving for disqualification under § 455(a) need not show actual bias because § 455(a) “concerns not only fairness to individual litigants, but, equally important, it concerns ‘the public’s confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.’ ” Alexander, 10 F.3d at 162 (quoting School Asbestos, 977 F.2d at 776).
B. Who is the Hypothetical Reasonable Person under § 155(a)?
Judge Wolin’s opinion of February 2, 2004 supporting his order denying the recusal motions held that the reasonable person under § 455(a) is someone “with the professional skills and experience in mass-tort [asbestos-related] bankruptcies sufficient to understand the import of the facts presented,” thus excluding “laypersons or attorneys not conversant with the basics of mass-tort bankruptcy practice.” Owens Corning, 305 B.R. at 190. In reaching that conclusion, Judge Wolin reasoned that, “where proceedings are by their nature inscrutable to outsiders, the wider world must rely upon those persons actually involved to report on those proceedings’ capacity to produce a fair result.” Id.
To the best of our knowledge, Judge Wolin’s gloss on § 455(a)’s “reasonable person” standard has no precedent. It also appears to be in tension with our observation in School Asbestos that § 455(a) was enacted by Congress because “ ‘people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.’ ” School Asbestos, 977 F.2d at 782 (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864-65, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)). Notably, the School Asbestos lawsuit was precisely the sort of complex, mass-tort litigation that Judge Wolin believed required a more nuanced definition of the reasonable person.
Judge Wolin distinguished School Asbestos on the ground that the appearance of impropriety in that case-the district court judge had attended a scientific conference organized by the plaintiffs’ counsel-“was simple enough for anyone to grasp.” Owens Corning, 305 B.R. at 190. Judge Wo-lin’s characterization suggests that the perception of impropriety in the Five Asbestos Cases is, by comparison, too complex for the average person to comprehend. We cannot agree.
No one disputes that asbestos bankruptcies are complicated, but the alleged perception of impropriety is fairly straightforward in this case. The gravamen of the Petitions is that Judge Wolin was tainted by the involvement of two court-appointed advisors who, at the same time that they were supposed to be giving neutral advice in the Five Asbestos Cases, represented a class of tort claimants in another, unrelated asbestos-driven bankruptcy and espoused views therein on the same disputed issues that are at the core of the Five Asbestos Cases.[13]
We are confident that the average layperson could grasp this alleged impropriety and, after being fully informed of all the surrounding circumstances, could draw a conclusion about Judge Wolin’s ability to render a fair and impartial decision. That being so, we perceive no reason to depart *303 from the traditional “man on the street” standard. See Moran v. Clarke, 296 F.3d 638, 648 (8th Cir.2002) (using “average person on the street” standard); Home Placement Serv., Inc. v. Providence Journal Co., 739 F.2d 671, 676 (1st Cir.1984) (same); Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir.1980) (same).
Judge Wolin’s definition of the hypothetical reasonable person is contrary to the goal of § 455(a). An attorney familiar with asbestos bankruptcies presumably would have a higher threshold for conflicts and alleged improprieties than the average layperson. This contravenes the purpose of § 455, which is “to promote public confidence in the integrity of the judicial process.” Liljeberg, 486 U.S. at 860, 108 S.Ct. 2194 (citing S.Rep. No. 93-419, p. 5 (1973); H.R.Rep. No. 93-1453, p. 5 (1974)). Accordingly, we agree with the Fourth Circuit Court of Appeals that the hypothetical reasonable person under § 455(a) must be someone outside the judicial system because judicial insiders, “accustomed to the process of dispassionate decision making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would.” United States v. DeTemple, 162 F.3d 279, 287 (4th Cir.1998); see also United States v. Jordan, 49 F.3d 152, 156-57 (5th Cir.1995) (remarking that average person on street “is less likely to credit judges’ impartiality than the judiciary”); In re Mason, 916 F.2d 384, 386 (7th Cir.1990) (noting that lay observer is less inclined to presume judge’s impartiality than members of judiciary). Thus, we hold that the appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson, who is not necessarily familiar with asbestos bankruptcies and litigation.
C. Did the Advisors have a Conflict of Interest?
Before we can decide whether the reasonable person might question Judge Wolin’s impartiality, we must determine if his Advisors had a conflict of interest. If not, then our inquiry comes to an end because the Petitioners will have failed to show that they have a clear and indisputable right to disqualification. On the other hand, if there was a conflict, then we must reach the question of whether that conflict might be perceived by the reasonable person as having tainted Judge Wolin.
Aside from the timeliness of the recusal motions, the existence of a conflict of interest by the Advisors may be the most sharply contested issue in these proceedings. Judge Wolin explained in his written opinion that he was an asbestos “neophyte” when he assumed control of the Five Asbestos Cases, and that he brought the Advisors on board to “inform the Court of the vast landscape of asbestos related issues that would permit the Court to make reasoned case management decisions.” Owens Corning, 305 B.R. at 198.
We conclude that two of the Advisors, Gross and Hamlin, did, in fact, operate under a structural conflict of interests at the same time that they served as Judge Wolin’s Advisors. This conflict arose from the dual roles they played in the Five Asbestos Cases and the G-I Holdings bankruptcy.
On the one hand, Gross and Hamlin clearly had a duty to remain neutral in the Five Asbestos Cases and to provide objective, unbiased information to Judge Wolin. As Judge Wolin stated in his original appointment order, the Advisors’ role “was to advise the Court and to undertake [certain] responsibilities, including by way of example and not limitation, mediation of *304 disputes, holding case management conference, and consultation with counsel.... ”
We would be hard pressed to overstate the importance of the Advisors’ role in the Five Asbestos Cases. As a result of their appointment, the Advisors had a unique level of access to Judge Wolin. Indeed, Judge Wolin himself acknowledged in a fee allowance order that the Advisors “oc-cup[ied] a unique position in the [Five Asbestos] cases not shared by other persons” and that they “funetion[ed] in a manner in all respects similar to examiners as provided in the Bankruptcy Code.” The Advisors also had a unique level of influence over Judge Wolin, given the role they played at the outset of the Five Asbestos Cases in educating Judge Wolin (a self-admitted neophyte) on all of the key asbestos-related issues.
On the other hand, Advisors Gross and Hamlin also had a duty to act as zealous advocates for the future asbestos claimants in the G-I Holdings bankruptcy. Hamlin was at all relevant times the legal representative of the present and future asbestos personal injury claimants in G-I Holdings and Gross served as his local counsel.[14] In those roles, Gross and Hamlin owed the future asbestos claimants in G-I Holdings a fiduciary duty to advance their interests and to see that they received the greatest possible share of the bankruptcy estate.[15] To achieve that end, the very Advisors who were advising Judge Wolin had to take positions in G-I Holdings and the Five Asbestos Cases that favored the future asbestos claimants. By their very position as representatives of the future asbestos claimants in G-I Holdings, Gross and Hamlin signaled to all that they could not be non-partisan, benign, or neutral.
Given their dual roles, we find that Gross and Hamlin had a conflict of interest. The structural conflict arose primarily out of the close relationship between the future asbestos claimants and the issues in the Five Asbestos Cases and G-I Holdings. In both proceedings, the debtors were leading manufacturers of asbestos products who were forced into bankruptcy by a flood of asbestos-related claims, including those of future claimants not yet identified. Consequently, many of the same legal issues (e.g., bar dates, proof of claim forms, medical manifestations, etc.) either have arisen or will arise in both the Five Asbestos Cases and the G-I Holdings bankruptcy. Both Judge Wolin and Advis- or Hamlin implicitly acknowledge that there existed a conflict of interest. Hamlin stated in his deposition that “[i]f any issue or any responsibility was sought from me [by Judge Wolin] in regard to any issue that I felt impinged on by G-I stuff, I would have asked that assignment be given to somebody else.” Specifically, Hamlin stated that “I wouldn’t have touched the personal injury bar date issue ... [b]ecause that’s what I’m dealing with *305 in G-I.” While the parties opposing recusal contend that this statement proves there was no conflict of interest, it proves just the opposite. Had there been no conflict, Hamlin would have perceived no need to reject any assignments in the Five Asbestos Cases.
Despite his conclusion that “no conflict exists,” Judge Wolin nevertheless shares Hamlin’s concerns. Recognizing that “[t]he core task of any futures representatives is to determine claim validity and claim valuation” for future claimants, Judge Wolin explains that no conflict materialized because “[t]he issues of claim valuation and future claimant versus present claimant equivalence have been neither briefed nor joined” in the Five Asbestos Cases. Owens Coming, 305 B.R. at 198. Judge Wolin’s statements further demonstrate the tension between Hamlin’s and Gross’s dual roles as advisors to Judge Wolin in the Five Asbestos Cases and Futures Representatives in G-I Holdings.
If Gross and Hamlin were precluded from addressing issues such as bar dates and claim valuation, we cannot understand how it could be appropriate for them to discuss other issues of importance to Futures Claimants in G-I Holdings. If both Hamlin and Judge Wolin would question the Advisors’ ability to remain neutral with respect to bar dates, a reasonable person certainly would be suspicious of discussions with the Advisors on potential affirmative defenses to liability, the proper content of proof of claims forms, or the processes for estimating claims under 11 U.S.C. § 502(c). See supra at 297 (discussing the subjects addressed in Judge Wolin’s ex parte meetings with the Advis-ors).
As discussed below in Section V-E, these suspicions are heightened by the ex parte nature of the communications between Judge Wolin and his Advisors. We do not hold that ex parte communications alone-in the absence of any conflict of interest-require recusal. We emphasize that it is the conflict of interest and not the particular specialty of the neutral expert or advisor that concerns us. A judge may engage an expert or someone to assist him who has no conflict and is “disinterested.” Here, however, we have concluded that the Advisors were conflicted and were not disinterested. Hence, any decision by us that would preclude a judge from obtaining assistance from a non-eonflicted advisor would unnecessarily restrict a judge’s ability to communicate with neutral experts. Indeed, a judge may consult ex parte with a disinterested expert provided that the judge “gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.” Code of Conduct for U.S. Judges Canon 3 § A(4) (2003).
A reasonable observer, understanding that certain issues were “off limits,” would be concerned by the absence of any mechanism to police those limits. Indeed, the record before the Court contains substantial evidence that these limits were, in fact, violated. Although Hamlin testified that a bar date was not discussed by the Advis-ors, and although Gross testified that he could not recall whether a bar date was discussed, the other three Advisors testified that the issue of whether and how to impose a bar date was discussed with Judge Wolin. Moreover, there is a substantial likelihood that many of the future claimants in G-I Holdings will also be future claimants in the Five Asbestos Cases because it is not unusual for asbestos claimants to bring claims against different asbestos manufacturers.
As counsel for Kensington argued:
[I]t is our view that Judge Wolin has rendered a number of rulings favorable to tort claimants after discussions with *306 the future — with the advisors who are Futures Representatives in G-I.
Do I have a signed, sealed confession, we urged this result on Judge Wolin and he then did it? No, I don’t have that. But the problem here is a 455(a) problem.
But this much is undeniable. On October 31st, 21 days before that [Nov. 21] status conference, Owens Corning circulated a draft plan of reorganization that was met, in letters in the record before you, with great approval by the commercial creditors and great disapproval by the tort creditors.
After the November 21st untranseribed hearing at which we recall Judge Wolin saying he did not like that plan, Owens Corning went back and formulated a brand-new plan that is so favorable to the tort claimants that they are copropo-nents of the plan. This is two days after meeting with Mr. Gross, a representative of future claimants. There are real appearance problems here, even if there are not certain types of smoking guns.
(.Transcript of April 19, 2003 Oral Argument at 47-48, 52-53.) Whether or not we reach the same conclusions that counsel did, the fact remains that the matters set forth in the depositions which we ordered, which are too voluminous to duplicate here but which we have studied, do reflect that counsel’s view of the § 455(a) problem is indeed accurate.
D. Did the Advisors’ Conflict Taint Judge Wolin?
We turn now to the question of whether Gross’s and Hamlin’s conflict of interest irreversibly tainted Judge Wolin. We obviously do not equate this “taint” of Judge Wolin with any wrongdoing or bias on his part. We are fully aware that the § 455(a) standard asks only if a reasonable person knowing all the circumstances might question Judge Wolin’s impartiality.
Judge Wolin stated in his opinion that he met with the Advisors as a group on only four occasions for a total of eighteen hours and that, after May 2002, “the Ad-visors as a group became functionally obsolete despite their de jure existence.” Owens Corning, 305 B.R. at 200. Judge Wolin also emphasized that his meetings with the Advisors consisted merely of discussions, which he defined as “consideration of a subject by a group; an earnest conversation,” and that he never received any advice, which he defined as an “opinion about what could or should be done about a situation or problem.” Id. at 198 (citing American Heritage College Dictionary 397, 20 (3d ed.1993)).
Judge Wolin’s distinction between discussions and advice cuts too fine a line. As Kensington points out, “[i]t is hard to fathom why Judge Wolin wanted [a] crash course in asbestos litigation if not to assist him in deciding ‘the merits’ of ‘disputed’ issues that he could expect to face.” Indeed, the four meetings in early 2002 between Judge Wolin and the Advisors covered almost all of the major issues in asbestos litigation, including the Rule 706 panel, claims bar date, claim forms, pleural registries, fraudulent conveyance claims, various defenses, claims estimation, trust distribution procedures, tensions among the creditor classes, and the asbestos claimants’ veto power under 11 U.S.C. § 524(g).
In deciding whether Gross and Hamlin’s involvement in the Five Asbestos Cases and interactions with Judge Wolin leads to disqualification under § 455(a), we find instructive the Fifth Circuit Court of Appeals’ decision in Hall v. Small Business Administration, 695 F.2d 175 (5th Cir.1983). In that case, the losing party *307 moved after trial to disqualify the judge and to vacate the judgment because it came to light that the judge’s law clerk had, among other things, accepted, prior to the judgment being entered, an offer to join the law firm which represented the winning party. Id. at 178. The judge denied the motion on the ground that the law clerk had never expressed an opinion to him about the winning party and because the law clerk had accepted the offer of employment only after the judge had made up his mind about the case and had written a rough draft of the opinion. Id.
On appeal to the Fifth Circuit, the court reversed and entered an order disqualifying the judge. In reaching that decision, the court remarked that the goal of § 455(a) “is to exact the appearance of impartiality” and therefore it was, in the court’s opinion, immaterial “[wjhether or not the law clerk actually affected the judge’s decision.” Id. at 179. The court also emphasized that law clerks hold a special position of trust and influence insofar that they are “sounding boards for tentative opinions and legal researchers who seek the authorities that affect the judge’s decision.”[16] Id.
The same factors that required recusal in Hall apply here. Although Gross and Hamlin were not law clerks per se, they were in some respects the substantial equivalent of law clerks.[17] Hamlin, for example, drafted legal opinions in each of the Five Asbestos Cases for Judge Wolin. Thus, not only was Hamlin the “legal re-searcherf] who [sought] the authorities that affect[ed] the judge’s decision,” but he was also the scrivener who, in the first instance, tried his hand at crafting the decision that, if accepted by Judge Wolin, would dispose of an appeal taken from the Bankruptcy Court in one of the Five Asbestos Cases. See id. Moreover, Gross and Hamlin held a special position of trust and influence because they, together with the other three Advisors, were perceived by Judge Wolin as being experts in the asbestos litigation field and depended on them to educate him on all the relevant issues.
There is, of course, nothing inherently wrong with appointing a panel of experts. But when ex parte discussions between the judge and the panel veer into the merits, recusal may follow. For example, in Edgar v. K.L., 93 F.3d 256 (7th Cir.1996), a district court judge appointed, with the parties’ consent, a panel of experts. Although the parties were aware that the panel had ex parte meetings with the judge from time to time to discuss administrative matters, the parties only discovered later that one of the meetings involved a discussion of the merits and possibly a preview of the panel’s final report. Id. at 257-58. When the parties moved to disqualify the judge, he blocked discovery and denied the motion. A petition for a writ of mandamus in the Seventh Circuit Court of Appeals followed. Id. at 257.
The Seventh Circuit issued a writ of mandamus disqualifying the judge. As to *308 § 455(a), the court held: “A thoughtful observer aware of all the facts ... would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality.” Id. at 259-60 (citations omitted). The court also noted that “[e]xperts appointed and supervised by a court carry special weight because of their presumed neutrality,” and that the panel of experts appointed by the district court judge were not truly neutral because they had been influenced by submissions from advocacy groups and counsel supporting plaintiffs in other lawsuits against the defendant.[18] Id. at 261-62.
The Edgar decision, like the Hall decision, is instructive in that the Seventh Circuit Court of Appeals did not hesitate to disqualify the district court judge under § 455(a) even though there was no evidence of actual bias. The theme running through both Edgar and Hall is that there is an almost irrebutable presumption that a judge is “tainted” and must be disqualified where, as here, he surrounds himself with individuals who may not be truly disinterested.
Some of the parties opposing Judge Wo-lin’s disqualification attempt to distinguish the Hall and Edgar decisions on the ground that the Five Asbestos Cases do not involve a district court’s relationship with its law clerks or court-appointed experts. The Respondents contend that court-appointed “Advisors,” such as Gross and Hamlin, are mere consultants, of whom pure neutrality is not required.
While the Respondents’ attempt to distinguish Hall and Edgar has some superficial appeal, we believe their approach values form over substance and relies too heavily on overly-technical categorizations. More importantly, it fails to take into account the underlying considerations that drove the courts’ decisions in Hall and Edgar. The primary concern in both Hall and Edgar is that a party which held a special position of trust and influence over the judge was found to be not truly disinterested in the outcome of the proceedings. The same can be said here. As court-appointed Advisors to Judge Wolin, Gross and Hamlin were given very broad powers. The order appointing them provided, among other things, that they could advise Judge Wolin, mediate disputes, hold case management conferences, and consult with the attorneys. Hamlin himself likened the powers that he exercised to those of a magistrate judge. Given these wide-ranging powers, surely the five Court-Appointed Advisors were under a duty to maintain at least the degree of neutrality normally required of law clerks or court-appointed experts. However, that neutrality was seriously compromised by virtue of their participation in G-I Holdings, a bankruptcy involving many of the same issues present in the bankruptcies assigned to Judge *309 Wolin, many of the same creditors, and possibly some of the same asbestos claimants.
We also note that Kensington’s Reply Brief emphasizes that over a 22-month period Judge Wolin received substantive information from:
• two Advisors (Gross and Hamlin), who had a fiduciary duty in G-I Holdings to advance the interests of the future asbestos claimants (Joint Appendix (“JA”) 1545);
• two Advisors (Gross and Hamlin), who had an incentive to make helpful precedent in the Five Asbestos Cases, which they could then rely on (and did rely on) in G-I Holdings in support of the future claimants (JA 1621, 978B, 980, 2728);
• three Advisors (Gross, Hamlin and McGovern) who met on multiple occasions with the future representatives in a wide range of asbestos-related cases (including the Five Asbestos Cases), to develop a common strategy with respect to pending asbestos legislation and to discuss common issues (JA 1645); and
• two Advisors (Gross and McGovern) who allegedly breached their duties as mediators by disclosing to Judge Wolin substantive positions of the mediating parties (JA 1393,1409,1412,1432).[19]
Given the unique level of access and influence that Gross and Hamlin had, the length of their appointment, and the overlapping issues and clients, we find that the reasonable person, with familiarity of these circumstances, would conclude that their conflict of interest tainted Judge Wolin.
E. The Ex Parte Communications Contributing to Taint
The extensive ex parte communications between Judge Wolin, on the one hand, and the Advisors and parties, on the other, further support disqualification under § 455(a). See United States v. Furst, 886 F.2d 558, 583 (3d Cir.1989) (disqualifying judge under § 455(a) because of ex parte communications). We have previously described ex parte communications as “anathema in our system of justice.” School Asbestos, 977 F.2d at 789. One leading reason is that ex parte meetings are often, as they were here, unrecorded. Consequently, there is no official record of what was said during those meetings. Of even greater concern is the argument urged upon us by the Petitioners who, without knowledge of what was discussed at these meetings, contended that they could not respond to these “silent” facts. As we explained in City of Pittsburgh v. Simmons, 729 F.2d 953 (3d Cir.1984):
The record taken by a certified court reporter is always the best evidence of what has been said, what actions have been taken, and what rulings have been made. “Meaningful review requires that the reviewing tribunal must be able to review a decision of a trial court ... to determine its correctness and if necessary control the course of the litigation whether by appeal or by use of a writ.... ” Wood v. Zapata Corp., 482 F.2d 350, 358 (3d Cir.1973) (Biggs, J., dissenting). Without a record of the proceedings “[w]e are left with conflicting statements of counsel which cannot be reconciled and, in any event, are not part of the record and therefore cannot serve as a basis for adjudication.” Id.
... Indeed, the best protection for the litigants, the bar, and the bench at trial and on appeal is a verbatim record. Rather than having to speculate upon *310 what was said and the manner in which an argument was made, the court then has before it, when a record is taken, the exact words of counsel and the exact words and rulings of the court. Thus, there is no need for characterization in affidavits or for reconstruction at a later date of what the parties or court thought each said or meant or what each intended.
Id. at 955-56.
The other problem is that ex parte communications run contrary to our adversarial trial system. The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials. See Polk County v. Dodson, 454 U.S. 312, 318, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (“The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness”). If judges engage in ex parte conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result.
Attuned to that concern, the Code of Conduct for United States Judges cautions that a judge should “neither initiate nor consider ex parte communications on the merits, or procedures affecting the merits, of a pending or impending proceeding.” Code of Conduct for U.S. Judges Canon 3 § A(4) (2003). The rule is designed to prevent all of the evils of ex parte communications: “bias, prejudice, coercion, and exploitation.” Jeffrey M. Shaman et al., Judicial Conduct and Ethics § 5.03 (3d ed.2000). The Code provides for only two narrow exceptions. First, “[a] judge may ... obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.” Code of Conduct for U.S. Judges Canon 3 § A(4) (2003). Second, “[a] judge may, with consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.” Id.
Judge Wolin apparently recognized the dangers of ex parte meetings, but relied on two “safeguards” to minimize the risk. First, Judge Wolin explained that all parties were welcome to participate in the ex parte meetings and “as one party left chambers, the next would arrive ready to debunk the ‘falsehoods’ of its predecessor.” Oioens Coming, 305 B.R. at 206. Second, Judge Wolin explained that he was “no babe in arms.” Id. This characterization, which finds expression in Judge Wolin’s February 2, 2004 opinion, is obviously in tension with his earlier self-characterization as an asbestos “neophyte.”
Unfortunately, we do not share Judge Wolin’s confidence that these safeguards adequately minimized the risks. Obviously Judge Wolin is correct when he states that he is “no babe in arms,” but the same could be said of the overwhelming majority of Article III judges. Moreover, the Code of Judicial Conduct does not draw a distinction between newly-appointed and veteran judges; the general prohibition against ex parte communications on the merits applies to all judges.
As for the second safeguard, we must first assume that all parties took equal advantage of Judge Wolin’s invitation to participate in ex parte meetings, even though experience informs us that certain parties may be more aggressive than others. But even if all parties met for the same amount of time with Judge Wolin, there was no way for them to adequately respond to or counter facts presented by their adversaries because they had no way of knowing what was said during those *311 unrecorded meetings. Thus, the risk of an incorrect result was still present. This would be of little consequence if the ex parte meetings had been limited to procedural matters, but Judge Wolin himself explained that “[t]he purpose of the ex parte meetings was to ensure that each committee or corporate constituency was afforded the opportunity to provide to the Court insights as to why, in the competition for limited dollars, its claim was just.” (Supp. Resp. at 3.) In other words, the ex parte meetings went to the very heart of the proceedings.
The ex parte meetings with the parties are flawed because, as we have explained, no opportunity existed for their adversaries to know precisely what was said, when it was said, by whom, and what effect could be drawn from their offerings. On the one hand, although all parties may at one time or another have been invited to an ex parte meeting with Judge Wolin, the probability of “slippage” and omission in the content of the material discussed, whether procedural or substantive, was evident. As we have stated, no one could know what had been said or proffered. On the other hand, Judge Wolin’s ex parte meetings with the Advisors presented an even more egregious problem. The instant record reveals a conflict as to what the Advisors brought to the meetings from their extrajudicial experience and, in the case of Hamlin and Gross, from their advocate roles in G-I Holdings, and the extent of their influence on the entire process. We know, for instance, that someone at one of the meetings disparaged a possible expert witness and criticized a defense. Of equal concern is the record’s disclosure that at a November 19, 2002 meeting attended by Advisors Gross, McGovern, and Dreier, matters of substance were discussed, but we have no knowledge about their content. The record is silent in this respect. Advisor Dreier made notes in handwriting which are under seal and we find difficult to comprehend. No discovery of that meeting was permitted by Judge Wolin.
We have previously discussed the distinction between our holding, that conflicted advisors who participate or influence a judge requires the judge’s disqualification, as distinct from an expert or other assistant to the judge who is disinterested and non-eonflicted. It should be understood that we do not hold that a judge may not or should not have ex parte meetings or communications with the parties or their counsel appearing before him. However, the hallmark of such meetings or communications requires the consent of the parties. We have pointed out in this section that the Code of Conduct for United States Judges proscribes ex parte communications except where the judge has entered into them with the consent of all the parties.
It will be recalled that Judge Wolin stated at the December 2001 Case Management Conference that:
In order to effectively case manage complex litigation, it is necessary for the judge to speak and/or meet with attorneys on an ex parte basis, without permission of adversary attorneys. Any objection to such ex parte communications is deemed waived.
While we have no record of any objections being registered at that time, we cannot regard the silence that accompanied the preemptive statement that “[a]ny objection to such ex parte communications is deemed waived” as manifesting consent. To fulfill the principles and objectives of Canon 3 of the Code of Conduct, which proscribes ex parte communications except with consent, affirmative consent is dictated. The record reveals no such consent was ever given.
*312 Given all of these considerations, we are confident that the reasonable person would be troubled by the fact that so many communications between Judge Wolin and Gross or Hamlin took place outside the presence of the parties. If the structural conflict of interests gave Gross and Hamlin a motive to give Judge Wolin less-than-neutral advice, it was the ex parte meetings that gave them the opportunity. In the absence of the parties, Gross and Hamlin were in a position to influence Judge Wolin without concern about judicial constraints or independent challenges from those individuals or entities with a stake in the outcome of the Five Asbestos Cases.[20]
F. Were the Recusal Motions Timely Under § 4.55(a)?
Notwithstanding that § 455 does not contain an express timeliness requirement, the Courts of Appeals cases that have addressed the issue have concluded that parties seeking disqualification under § 455(a) should do so in a timely manner. See, e.g., In re IBM Corp., 45 F.3d 641, 643 (2d Cir.1995); In re Apex Oil Co., 981 F.2d 302, 304 (8th Cir.1992). The reason most often given for applying a timeliness requirement to recusal motions is that “[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming.” Smith v. Danyo, 585 F.2d 83, 86 (3d Cir.1978). Yet timeliness, as the Court in Danyo stated, is but one of the factors which engages a court’s discretion in determining whether a judge shall be relieved from its assignment. Id.
On remand, Judge Wolin concluded that the motions seeking his recusal were untimely under § 455(a). In reaching that holding, Judge Wolin charged that the Petitioners either knew or should have known about Gross and Hamlin’s participation in G-I Holdings long ago, but waited until October 2003 to act on that information. Judge Wolin also questioned the Petitioners’ true motivations for filing the recusal motions, claiming that they were not based on ethical considerations but were strategic maneuvers by the Petitioners calculated to gain a larger percentage of the bankruptcy estates, either through a legislative solution or through delay.[21]
*313 Judge Wolin and the parties opposing recusal have focused primarily on Mark Brodsky, the senior portfolio manager at Elliot Management, which provides services to Kensington’s parent companies. Brodsky testified that he first learned about Gross and Hamlin’s participation in G-I Holdings on September 24, 2003, a little more than two weeks before Kensing-ton filed the first of the recusal motions. Brodsky testified that he acquired this knowledge from another Owens Corning creditor who brought to his attention an opinion issued in the G-I Holdings bankruptcy. While reviewing that opinion, Brodsky noticed that Advisor Gross was listed as the counsel for the Futures Representative. This, in turn, prompted an investigation by Brodsky which disclosed Hamlin’s role in G-I Holdings. Brodsky’s claim that this was the first time he learned of Gross and Hamlin’s participation in G-I Holdings is corroborated by a September 24, 2003 e-mail in which Brodsky expresses shock at Gross’s involvement in G-I Holdings.
It is not surprising, therefore, that Judge Wolin in his written opinion found that Brodsky (or, for that matter, D.K. Acquisition Partners) did not have actual knowledge of Gross or Hamlin’s participation in G-I Holdings prior to September 2003.[22] He did conclude, however, that they either had constructive or imputed knowledge prior to September 2003.
As we understand the phrase, constructive knowledge is “knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person.” Black’s Law Dictionary 876 (7th ed.1999). Judge Wolin implied that Brodsky had constructive knowledge of the Advisors’ conflict because: (a) Hamlin’s appointment as the Futures Representative and Gross’s selection as local counsel in G-I Holdings was a matter of public record; (b) asbestos-related trade periodicals reported Hamlin and Gross’s involvement in G-I Holdings; and (c) many of the attorneys involved in the Five Asbestos Cases knew about Hamlin or Gross’s involvement in G-I Holdings. As Judge Wolin explained it, “Brodsky surrounded himself with a coterie of experienced and sophisticated lawyers who through even a modicum of effort would have unearthed Hamlin’s and Gross’s G-l appointments.”
We believe Judge Wolin improperly placed the burden on the Petitioners to uncover Gross and Hamlin’s participation in G-I Holdings. Such a requirement does not further the purpose of § 455(a), which “mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice.” Alexander, 10 F.3d at 157. In the recusal context, we are satisfied that if there is to be a burden of disclosure, that burden is to be placed on the judge to disclose possible grounds for disqualification. See United States v. Bosch, 951 F.2d 1546, 1555 n. 6 (9th Cir.1991) (noting that § 455(a) “has a de facto disclosure requirement.”); see also Parker v. Connors Steel Co., 855 F.2d 1510, 1525 (11th Cir.1988) (recognizing that recusal motion could have been avoid *314 ed if judge had disclosed grounds for recu-sal to parties).
As we stated in United States v. Schreiber, 599 F.2d 534, 537 (3d Cir.1979), “sound public policy considerations ... militate for the adoption of a ... rule that the parties should be apprised of any possible ground for disqualification known privately to the judge.” The most compelling of these public policy considerations is that the judge is in the best position to know of the circumstances supporting a recusal motion. The Five Asbestos Cases are no exception.
The record in this case demonstrates that Judge Wolin knew about Gross and Hamlin’s participation in G-I Holdings from or near the inception of Hamlin’s appointment as the Futures Representative.[23] Moreover, at least one of the parties (USG Corp.) brought Hamlin’s potential conflict to Judge Wolin’s attention in February 2002, more than one-and-one-half years before Kensington filed its recu-sal motion.[24] It is undisputed, however, that Judge Wolin never disclosed to the parties, either on or off the record, that Gross and Hamlin were actively participating as zealous advocates in G-I Holdings.
There may be instances in which constructive knowledge is so pervasive that it is tantamount to actual knowledge, but this is not one of those instances. See, e.g., Nat’l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 958-59 (2d Cir.1978) (finding that parties had constructive knowledge of judge’s former affiliation with a large law firm located in same community); Universal City Studios v. Reimerdes, 104 F.Supp.2d 334, 353 (S.D.N.Y.2000) (same).[25] The parties’ access to a burgeoning stream of information in the Five Asbestos cases does not naturally lead to the conclusion that they should have known about the participation of Hamlin and Gross in G-I Holdings. We are persuaded that nothing short of actual knowledge of the facts giving rise to the recusal motions and the Petitions for Mandamus would satisfy the § 455(a) timeliness factor here.
In addition to relying on constructive knowledge, Judge Wolin found that the Petitioners had imputed knowledge of Gross and Hamlin’s participation in G-I Holdings. “Imputed knowledge” means that knowledge attributed to one person may be deemed to give notice to another party.
We agree with Judge Wolin that imputed knowledge can, under limited circumstances, render a recusal motion untimely. For example, when a party’s attorney is *315 aware of the grounds supporting recusal, but fails to act until the judge issues an adverse ruling, the recusal motion is not timely See, e.g., E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir.1992) (denying as untimely motion for disqualification where party’s attorney knew about alleged conflict but did not file motion until after judgment was entered against him). Aside from the fact that the attorney is only one step removed from the client, the attorney and client have an agency relationship and therefore any facts known by the attorney may generally be imputed to the client. See Restatement (Second) of Agency § 9(3) (1958) (“A person has notice of a fact if his agent has knowledge of the fact....”).
We do not, however, agree with Judge Wolin that the recusal motions in the Five Asbestos Cases present an appropriate avenue for imputing knowledge to the Petitioners. There are simply “too many dots that must be connected” before the Petitioners can be deemed to have known about Gross and Hamlin’s participation in G-I Holdings. For example, Judge Wolin determined that knowledge could be imputed to Kensington through the law firm of Davis Polk & Wardwell, which is lead counsel for the Unsecured Creditors Committee in the Owens Corning bankruptcy. A Davis Polk partner testified that he received an e-mail in October 2001 disclosing Hamlin’s appointment in G-I Holdings. Judge Wolin concluded that this constituted notice to the Petitioners in Owens Corning because the Unsecured Creditors Committee and Davis Polk owed a fiduciary duty directly to Kensington.
While it is true that the Unsecured Creditors Committee in Owens Corning represented Kensington’s interests in the Owens Corning bankruptcy, it is established that a Creditors Committee owes a fiduciary duty to the unsecured creditors as a whole, not to the individual members. See Drexel Burnham Lambert Group, 138 B.R. 717, 722 (Bankr.S.D.N.Y.1992) (“The duty [of the committee and its counsel] extends to the class as a whole, not to its individual members.”); In re Levy, 54 B.R. 805, 807 (Bankr.S.D.N.Y.1985) (“Counsel for the creditors’ committee do not represent any individual creditor’s interest in this case; they [are] retained to represent the entire unsecured creditor class.”). So while the Committee had a duty to represent the collective interests of the unsecured creditors, it did not have the authority to bind each individual creditor. This stands in stark contrast to the attorney-client relationship we discussed above.
In looking at the issue of timeliness through the lens of imputed knowledge, we find that the record in this case discloses facts that are too far removed and far too attenuated from the concept of knowledge that would cause a party to take action to vindicate their interest. We have pursued the trail of imputed knowledge that the record has laid out before us, and we are satisfied that the knowledge allegedly imputed could not have led any of the participants to the point where they could be deemed to have “known” about the conflict of the Advisors. If connecting the dots could not have led to such a conclusion, then it is evident to us that in order to sustain the principles of § 455(a), where a judge’s impartiality may appear to be questioned, we must require actual knowledge (or its undeniable equivalent) to be shown. Because the Petitioners in Owens Corning and W.R. Grace & Co. did not have actual knowledge of the conflict of the Advisors which we have discussed and which the record discloses, we hold that the motions seeking Judge Wolin’s recusal under § 455(a) were timely.
G. Disqualification Under § 155(b)(1)
We express no view on the timeliness of the motions for disqualification under *316 § 455(b)(1). As mentioned above, the Petitioners also seek Judge Wolin’s disqualification under § 455(b)(1) on the basis of his ex parte communications with the Advis-ors, parties, and attorneys. Because we have determined that Judge Wolin must be disqualified under § 455(a), there is no need to reach the issues of timeliness or the merits of § 455(b)(1). See School Asbestos, 977 F.2d at 781 (declining to reach § 455(b)(1) issue where disqualification was warranted under § 455(a)). Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge’s impartiality might reasonably be questioned.[26]
VI. USG Debtors and the Official Committee of Unsecured Creditors (collectively, “USG”)
As we previously indicated, USG stands in a different posture than does Kensington or D.K. Acquisition Partners insofar as Judge Wolin’s disqualification is concerned. The record reveals, with no uncertainty, that Kensington and D.K. Acquisition Partners did not have actual knowledge of the Advisors’ conflict until September and October 2003, respectively, and that they filed motions seeking Judge Wolin’s disqualification weeks later.
On the other hand, USG became aware of the Advisors’ conflict in January 2002. See Note 24, supra. It did not take any action, however, until after the motions filed by Kensington and D.K. Acquisition gave rise to a similar motion by USG. We assume this is the reason why USG’s motion (and ensuing Petitions for Mandamus) focused principally on § 455(b)(1) and the ex parte communications that Judge Wolin had with the Advisors, the parties, the attorneys, and others. We will not speeu-íate, however, on this score because USG’s Petitions were also couched in terms of § 455(a) and dealt as well with the Advis-ors’ conflict which we have discussed in connection with the Kensington and D.K. Acquisition Partners Petitions.
If timeliness turned solely on “actual knowledge” and constituted the only factor we could consider in deciding whether to reach the merits of a recusal motion, we might well have second thoughts about relieving Judge Wolin of his assignment over the USG Corp. bankruptcy. But as we explained earlier in this opinion, timeliness is just one of the factors-albeit a significant one-which engages our discretion in determining whether another judge should be assigned to oversee the USG Corp. bankruptcy. See Danyo, 585 F.2d at 86.
As the Danyo Court noted and as we have recounted, “[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming.” Id. at 86. The Danyo Court went on to caution circumspection by stating “[b]ut especially when the circumstances giving rise to the charge of bias occur or are discovered after the case has commenced, timeliness should be measured not in some absolute and arbitrary manner from the date of discovery, but with respect to the future stages of the case. ” Id. at 86 (emphasis added). Danyo then instructs us that we are to consider an appropriate accommodation between the competing institutional interest in avoiding the appearance of impropriety, on the one hand, and avoiding *317 the abuse of § 455(a) procedure, on the other. Cf. id.
The record informs us that the USG debtors had one meeting with Judge Wolin in early 2002. At the time that it filed its motion to recuse Judge Wolin, it had received but one ruling in all the intervening time, and that ruling was a decision that favored it.[27] As USG’s Unsecured Creditors Committee has argued, § 455(a) contains no explicit timeliness requirement and “the seriousness of the grounds for recusal that exist on this record far outweighs any significance that might exist on the date the Motion was filed.”[28] If, as USG claims, public policy is the polestar to which we must look, it is these concerns of public policy that are implicated in USG’s Petitions.
First, Judge Wolin had issued just one adverse ruling at the time that USG’s motion was filed and, as mentioned, this ruling was favorable to USG. As both the USG Committee and USG Debtors have taken pains to point out, Judge Wolin has issued no substantive rulings in their case at all, other than the one ruling which we have just recounted. Moreover, the Motions to Recuse filed by USG were filed only after the Owens Corning Petitioners and the W.R. Grace Petitioners had filed theirs. It is of interest to note that insofar as the Petitions seeking disqualification of Judge Wolin, none of them seeks to overturn any of his prior rulings. Rather, the recusal proceedings are concerned only with his continuing into the “future stages” of these cases.
USG seeks Judge Wolin’s recusal because, as we have been made aware during the discovery that took place after our first hearing, the Advisors billed their fees equally to each of the Five Asbestos Cases on the theory that the issues concerned each case equally. There is, therefore, some logic in USG’s argument that it should be entitled to the same remedy which we have decided is necessary in Owens Corning and W.R. Grace.
We are not disposed to have the issue of timeliness trump what we have concluded are the principles of § 455(a), even though the record discusses no improper acts by Judge Wolin. In light of the record that has been developed, and in light of the factors which have been outlined in Danyo, supra, and their application to USG, we are satisfied that, in the unique context of this case, it is appropriate for us to disqualify Judge Wolin from administering the USG bankruptcy, just as we have disqualified him from administering the Owens Corning and W.R. Grace bankruptcies.
VII.
We would be remiss if we did not close this opinion, which concerns Senior District Judge Alfred M. Wolin, with thoughts that were so ably expressed years ago by our colleague, Senior Judge Ruggero J. Aldisert. Judge Aldisert wrote for the Court in Haines v. Liggett Group, Inc., 975 F.2d 81, 98 (3d Cir.1992), a case which required the reassignment of another distinguished District Court Judge. The Court held in Haines that Judge Sarokin, the district court judge who had to be *318 reassigned, had exhibited the “appearance of partiality” in presiding over an action against the Tobacco Industry. We take the liberty of repeating verbatim Judge Aldisert’s words as they appeared in the Haines opinion because they are so appropriate and relevant here:
The right to trial by an impartial judge “is a basic requirement of due process.” In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). To fulfill this requiremenWand to avoid both bias and the appearance of bias-this court has supervisory authority to order cases reassigned to another district court judge. Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Therein we stated:
Impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system. In Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968), the United States Supreme Court stated: “[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.”
671 F.2d at 789. See also Nicodemus v. Chrysler Corp., 596 F.2d 152, 157 (6th Cir.1979); United States v. Robin, 553 F.2d 8, 10-11 (2d Cir.1977) (en banc) (per curiam). Reassignment is appropriate to “preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice.” United States v. Torkington, 874 F.2d 1441, 1447 (11th Cir.1989).
The district judge in this case has been a distinguished member of the federal judiciary for almost 15 years[29] and is no stranger to this court; he is well known and respected for magnificent abilities and outstanding jurisprudential and judicial temperament. On the basis of our collective experience, we would not agree that he is incapable of discharging judicial duties free from bias or prejudice. Unfortunately, that is not the test. It is not our subjective impressions of his impartiality gleaned after reviewing his decisions these many years; rather, the polestar is “[ijmpar-tiality and the appearance of impartiality”
Haines, 975 F.2d at 98.
VIII. CONCLUSION
We conclude as follows:
The Kensington, D.K. Acquisition Partners, and USG Corp. Petitioners have demonstrated a clear and indisputable right to have the Writs of Mandamus issue. The record reveals that the Advisors’ conflict, which cannot at this stage be disassociated from Judge Wolin as well as the ex parte meetings that the Advisors and Judge Wolin participated in, reveal an abuse of discretion that requires disqualification. If these circumstances were revealed to a reasonable person, it would undoubtedly lead to a perception that Judge Wolin’s impartiality might be seriously questioned.
As to Kensington, D.K. Acquisition Partners, and USG Corp., who have asked us to issue a Writ of Mandamus disqualifying Judge Wolin from further presiding over the Owens Corning, W.R. Grace & Co. and USG Corp. bankruptcies, we will grant their request.
*319 We will take no action at this time with respect to the Armstrong World Industries, Inc. bankruptcy, but will schedule appropriate briefing and argument on the Petition for Mandamus filed by the Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.
We will take no action in the Federal-Mogul Global, Inc. bankruptcy, leaving its administration with Judge Wolin.
We will vacate any and all stays that we previously imposed on the District Court and Bankruptcy Court proceedings, so that the matters pending or to be brought before the District and Bankruptcy Courts may be resumed.
Because Judge Wolin, a United States District Court Judge from the District of New Jersey, was appointed in the District of Delaware as Coordinator of Case Management for the Five Asbestos Cases by the then-Chief Judge of this Court (Senior Judge Edward R. Becker), we deem it appropriate to file this Opinion and Writ of Mandamus with the present Chief Judge of this Court (Judge Anthony J. Scirica) for either appointment or reassignment of the Owens Coming, W.R. Grace & Co. and USG Corp. bankruptcies to another judge within the Third Circuit pursuant to 28 U.S.C. § 292(b).[30]

. The Petitioners had originally moved for recusal in the Bankruptcy Court, but filed Petitions for Writs of Mandamus in this Court after Judge Wolin withdrew the recusal motions from the Bankruptcy Court and stayed the corresponding discovery. At the time that the Petitions were filed, Judge Wolin had not ruled on the recusal motions.

. The following amicus curiae supported the recusal petitions: American Insurance Partners and Washington Legal Foundation.

. Amicus curiae Eric Green, Legal Representative for Future Asbestos Personal Injury Claimants in Federal Mogul Global, Inc., supported the entities opposing recusal.

.As a matter of historical interest, then-District Court Judge Sarokin was assisted in an action involving the Tobacco Industry by a Magistrate Judge and a Special Master. See *296 Haines v. Liggett Group Inc., 975 F.2d 81 (3d Cir.1992).

. An amicus curiae brief was filed by Eric D. Green, who is the representative for future asbestos personal-injury claimants in the Federal-Mogul bankruptcy. See note 3 supra. An amicus curiae brief does not trigger our jurisdiction and we lack the authority to issue a writ of mandamus to non-parties. See In re School Asbestos Litig., 977 F.2d 764, 798 (3d Cir.1992).

. "Of the three basic kinds of asbestos fibers-amosite, crocidolite, and chrysotile-the straight, solid amosite and crocidolite fibers are less likely to break up in the lungs and *298 more likely to cause mesothelioma than are the curly, hollow chrysotile fibers.” Menne v. Celotex Corp., 861 F.2d 1453, 1456 (10th Cir.1988). Thus, asbestos manufacturers sometimes raise a so-called "chrysotile defense” when sued by asbestos victims. We have stated, however, that "[t]he absence or presence of chrysotile in asbestos products is not an affirmative defense which would require the presentation of any evidence....” Blancha v. Raymark Indus., 972 F.2d 507, 514 (3d Cir.1992).

.Pleural plaques is a medical condition that consists of extensive pleural thickening on the exterior of the lungs. See Dunn v. HOVIC, 1 F.3d 1362, 1365 (3d Cir.1993). Pleural plaques are "frequently seen in people who have been exposed to significant doses of asbestos.” Rogers v. Raymark Indus., 922 F.2d 1426, 1428 (9th Cir.1991).

. 11 U.S.C. § 502(c) states: "[t]here shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.”

. Rule 706 of the Federal Rules of Evidence permits the court to appoint an independent panel of expert witnesses.

. The Petitioners argue that a reasonable person could perceive that Judge Wolin’s impartiality could reasonably be questioned in this sequence of events.

. Around the same time that Judge Wolin filed his second response, USG Corporation filed a motion in the Bankruptcy Court seeking his recusal. USG Corporation argued that the extensive ex parte communications between Judge Wolin and the Advisors (as well as other persons) provided an independent basis for Judge Wolin’s disqualification under both 28 U.S.C. § 455(a) and (b)(1).

. It is somewhat strange to speak in terms of an abuse of discretion where the underlying statute, 28 U.S.C. § 455, states that a judge "shall” disqualify himself or herself if certain grounds are present. The abuse of discretion standard may be an anachronistic vestige of an earlier version of § 455. Prior to 1974, § 455 provided in its entirety that a judge had to "disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.” 28 U.S.C. § 455 (amended 1974) (emphasis added). Under that version, a judge had broad discretion to deny a recusal request even if the grounds for recusal were present. To the extent judges continue to retain any discretion under the post-1974 version of § 455, it is only to determine if the "facts asserted as comprising bias, a forbidden financial interest, kinship, or the appearance of partiality bring the trial court judge within the disqualifying definition.” 2 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 12.05 (3d ed.1999). If the answer to that inquiry is "yes,” disqualification must follow.

. The Petitions also assert that Judge Wolin should be recused because of his ex parte communications with the Advisors and the parties, but that is grounded primarily in § 455(b)(1), which does not employ a reasonable person "perception” standard.

. As we noted earlier, W.R. Grace & Co.’s motion to appoint Hamlin as a Futures Representative was withdrawn in light of Bankruptcy Judge Fitzgerald's reaction.

. Some of the parties opposing Judge Wo-lin’s disqualification have emphasized that the future claimants in G-I Holdings are, as yet, unidentified individuals because they have not yet developed any outward medical symptoms as a result of their exposure to asbestos. We are not persuaded that this is a mitigating factor. Although the future claimants are, by definition, a group of unknown individuals, their interests in pursuing claims against the asbestos manufacturers are clearly identifiable and, as such, Hamlin and Gross were duty-bound to further the claimants' collective interests. In this sense, Hamlin and Gross's role could be likened to that of a class representative and his attorney at the inception of a class action lawsuit, before the class members are identified.

. The Ninth Circuit Court of Appeals discussed a similar motion for recusal in First Interstate Bank of Atizona v. Murphy, Weir & Butler, 210 F.3d 983 (9th Cir.2000). There, a bankruptcy judge recused herself because her law clerk had continued to have some contact with a Chapter 11 bankruptcy proceeding after the law clerk accepted an offer to join the law firm representing the creditors. Id. at 985.

. The “hybrid” status of the Advisors has given us considerable concern. That concern is expressed in note 20, infra. As counsel for Respondent Owens Corning admitted at our first hearing, he had no knowledge of such a hybrid status or of individuals having assumed that status being asked to assist a judge.

. The Edgar court held that the district court judge had acquired ''personal” knowledge from the panel of experts, which is another way of saying that the judge acquired information from an extrajudicial source. Edgar, 93 F.3d at 259. The extrajudicial source doctrine, as it is commonly known, provided at one time that recusal was not warranted unless the grounds for recusal emanated from an extrajudicial source (i.e., a source outside of the judicial proceedings at hand). See Liteky v. United States, 510 U.S. 540, 544-545, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In Liteky, the Supreme Court held that the extrajudicial source also applied to § 455(a), but it tempered its effect by explaining that it was merely a factor and not a prerequisite for disqualification. Id. We agree with the Edgar court that off-the-record discussions on substantive issues in chambers constitute "personal” or "extrajudicial” knowledge in the sense that the information conveyed to the judge leaves no trace in the record and cannot "be controverted or tested by the tools of the adversary process.” Edgar, 93 F.3d at 259.

. Kensington alleges that Advisors Gross and McGovern, who served as mediators in the Owens Corning bankruptcy, improperly shared with Judge Wolin information that they had gained from the parties during the course of mediation.

. We have previously noted that the Advisors chosen by Judge Wolin were not of the judicial family in the sense that they were neither magistrate judges, law clerks, or special masters. As such, the Advisors were not subject to the constraints imposed upon judicial personnel, either through the Code of Conduct for United States Judges, the Code of Conduct for Judicial Employees, or Bankruptcy Rule 9003 ("Prohibition of Ex Parte Contacts”). We do not imply that because of their hybrid status as Advisors, that the Advisors breached any of the rules by which judicial personnel are bound. We cannot help but point out, however, that judicial personnel could not have undertaken or been engaged in positions or other functions at odds with their judicial position. We are obliged to look with disfavor upon appointment of personnel who have the access and influence with the judiciary that the Advisors had and yet are not constrained from accepting positions that conflict with their advisory duties. See Code of Conduct for United States Judges Canon 3 § (B)(2) (stating that "[a] judge should require court officials, staff, and others subject to the judge’s direction and control, to observe the same standards of fidelity and diligence applicable to the judge”) (emphasis added); see also Notes 4 and 18, supra.

. Congress has recently undertaken an attempt to improve the current asbestos litigation system. See 150 Cong. Rec. S4103-S4114 (daily ed. Apr. 20, 2004). Senator Hatch, Chairman of the Senate Judiciary Committee, has introduced Senate Bill 1125, the Fairness in Asbestos Injury Resolution Act ("FAIR” Act), which is designed to bring compensatory relief to those suffering from mesothelioma and asbestosis. If enacted in *313 its current form, the bill would create for the benefit of asbestos victims a $114 billion fund under the auspices of a streamlined no-fault system. See id. Senator Frist has described this proposal as "a substantially better means of obtaining compensation than through bankruptcy trusts.” Id. at S4105. Insurers and defendant companies for the most part support the bill.

. At the hearing which Judge Wolin held in January 2004, he stated, when questioned if he disbelieved Brodsky, "I don't disbelieve Mr. Brodsky as a matter of fact.”

. Gross submitted an affidavit which declared: "At all relevant times, Judge Wolin was aware of my representation of Mr. Hamlin in G-I Holdings.” This was corroborated by Hamlin, who testified at his deposition that he informed Judge Wolin at the outset that he was the Futures Representative in G-I Holdings.

. The record contains a stipulation signed by USG Corp.'s counsel which unequivocally states that USG Corp. learned in January 2002 about Hamlin's appointment in G-I Holdings. That same month, Judge Wolin issued an order appointing Hamlin to serve as a Special Master in the USG Corp. bankruptcy. Although USG Corp. acquiesced to that appointment, it wrote Judge Wolin a letter expressing its concern that "an unsatisfied party” might later try to overturn an approved plan of reorganization by claiming that Hamlin was conflicted.

.The parties opposing recusal have directed our attention to In re Allied-Signal, Inc., 891 F.2d 967 (1st Cir.1989), wherein the Court of Appeals for the First Circuit affirmed a district court judge's decision not to recuse himself based in part on constructive knowledge. It is important to note, however, that this observation was not made in the context of a timeliness determination under § 455(a), but rather on assessment of the merits.

. Because we are not addressing disqualification under § 455(b)(1), we express no view as to whether the claims made by the Ped-tioners relying on § 455(b)(1) require disqualification.

. On February 19, 2003, Judge Wolin issued a case management order instructing the USG Debtor to propose a bar date for asbestos cancer claimants and proof of claim form. This ruling had been opposed by the asbestos claimants.

. Brief of Petitioner the Official Committee of Unsecured Creditors of USG Corporation, et al. in Support of Petitions for a Writ of Mandamus (citing In re Edgar, 93 F.3d at 257 (noting that "passage of time is not conclusive if the justification for disqualification is compelling”)).

. Judge Wolin has been a federal district court judge for seventeen years. Prior to joining the federal judiciary, he served as a judge on the County District Court and Superior Court of New Jersey for seven years.

. 28 U.S.C. § 292(b) provides: "The chief judge of a circuit may, in the public interest, designate and assign temporarily any district judge of the circuit to hold a district court in any district within the circuit.”